## The State v. Miller, *Appellant.*

1. **Criminal Practice:** MURDER: DISMISSING A COUNT. On a trial for murder, where defendant is charged as principal in some of the counts, it is error to dismiss, against his objection, a count which charges a co-defendant as principal and defendant as accessory after the fact, when there was evidence tending to prove the latter charge.

2. ———: ———: INSTRUCTION. It is also error in such case to instruct the jury, at the request of the state, that, under the evidence, they must find the defendant guilty or acquit him.

3. ———: EVIDENCE: WITNESS WHO HAS BEEN IN PENITENTIARY. A witness, for the purpose of discrediting him, may be asked if he has been in the penitentiary. It is not necessary to produce the record of conviction for such purpose.

4. ———: ACCOMPLICE: INSTRUCTION. An instruction that the evidence of an accomplice, "when not corroborated by the testimony of others, not implicated in the crime, as to matters material to the issues, ought to be received with great caution by the jury," is erroneous, because it does not explain the meaning of the words' "matters material to the issues," and, also, in that it fails to tell the jury that, in order to the corroboration of the testimony of an accomplice, such corroboration should go to the extent of identifying the person of the prisoner against whom the accomplice speaks.

5. **Murder in Perpetration of Burglary.** Murder in the perpetration, or the attempted perpetration, of a burglary constitutes murder in the first degree.

6. **Criminal Practice:** ADDITIONAL INSTRUCTIONS. It is competent for the trial court to give the jury additional instructions when they return into court and request the same, where it is done in open court, and in the presence of counsel.

7. ———: ———: PRESENCE OF DEFENDANT. Where such additional instructions are given, it will be presumed, in the absence of anything in the record to the contrary, that the defendant was present.

8. **Murder:** AIDERS AND ABETTORS: INDICTMENT. A person aiding or abetting in the commission of a murder is a principal in, the eye of the law, and the indictment may either allege the matter according to the fact, or charge both of the participants as principals in the first degree, the act of one being the act of the other.

9. ———: EVIDENCE : TESTIMONY OF WIFE OF CO-DEFENDANT. Where two persons are charged with murder, it is proper to admit the testimony of the wife of one of them as to a conversation she heard between her husband and the other defendant, to show that the latter participated in the crime, when she gave all the conversation, or all that she heard.

10. ———: ———: AGREEMENT TO TESTIFY AGAINST CO-DEFENDANT. Where two persons are charged with murder in the first degree, it is error to admit the testimony of one against his co-defendant upon an agreement "to testify against" him, in consideration of the prosecuting attorney accepting a plea, by the witness, of guilty of murder in the second degree, and of entering a *nolle* on several other indictments pending against him.

11. ———: CASE FOR JURY. The evidence in this case on the part of the state *held* sufficient to entitle the case to go to the jury, even if the testimony of the accomplice be disregarded.

*Appeal from Audrain Circuit Court.*—HON. E. M. HUGHES, Judge.

REVERSED AND REMANDED.

*W. O. Forrist* and *W. A. Edmonston* for appellant.

(1) It was error to overrule appellant's objection to the competency of Mrs. Mortimer as a witness for the state. She was the wife of Mortimer, who was, in law, a co-defendant, and charged with the same homicide. They were not indicted jointly, but the law required them to be. R. S. 1879, sec. 1811. The state could take no advantage of its own wrong. Neither, under our statute or the common law, is a defendant, while a party to the record and his case undisposed of, nor his wife, a competent witness for the state against his co-defendant. Whart. Crim. Ev. [9 Ed.] sec. 445, and authorities cited; R. S. 1879, secs. 1917 and 1918. (2) It was also error to allow Mrs. Mortimer to testify to a fragment of a conversation she overheard between her husband and appellant, against his objection, as well, as not to strike the same out of the record, as requested.

There is no rule of law better established than that an entire conversation, or none of it, can go in evidence to charge a party with a crime. This is shown by *State v. Branstetter*, 65 Mo. 145, and the authorities there cited. (3) It was error to sustain the state's objection to appellant's inquiry of Mortimer if he had not been in the penitentiary two or three times, and not allowing it to be answered. The inquiry was not whether he had been sentenced to the penitentiary, or had been convicted of a felony, but simply was whether he had been in one. This could not be shown by any record. Appellant was entitled to the answer. (4) There was no corroboration of the evidence of Mortimer in any material matter, and, yet, without his evidence, appellant could not be convicted. The "matters material to the issues," in the sixth instruction for the state should have been defined. *State v. Chyo Chiagk*, 92 Mo. 395; *State v. Conway*, 21 S. E. Rep. 285; *State v. Suryear*, 2 S. W. Rep. 929.

*John M. Wood*, Attorney General, *F. R. Jesse*, Prosecuting Attorney, and *George Robertson* for the State.

(1) At the time Mattie Mortimer, the wife of George Mortimer, was called as a witness the indictment was standing against Mortimer and he had pleaded not guilty to it, but afterwards, and during the progress of the trial, this plea was withdrawn by Mortimer and he entered a plea of guilty of murder in the second degree. Mortimer was not a co-defendant and he was competent as a witness against Miller (Bishop Crim. Proc., sec. 1167; *State v. Walker*, 98 Mo. 95), and as a matter of course his wife was competent. Whart. Crim. Ev. [8 Ed.] sec. 391. Even if the conversation testified to were a part of a conversation, the rest of which witness did not hear, it would be admissible. She said that was all she heard. Whart. Crim. Ev. [9 Ed.] sec. 688,

and authorities there cited. (2) Defendant complains that he was not allowed to ask the witness, Mortimer, if he had not been in the penitentiary, the only purpose of which was to discredit the witness' testimony, by showing that he had been convicted of a felony. This should have been shown by the record, and the court committed no error. (3) Defendant complains of instruction numbered 6, in relation to the testimony of an accomplice. It is in the language of the instruction approved in *State v. Jones*, 64 Mo. 391, and followed in *State v. Reavis*, 78 Mo. 419, and cited with approval in *State v. Walker*, 98 Mo. 109. But, upon an examination of the whole evidence in this case, the defendant, without the evidence of the accomplice, Mortimer, is abundantly proven guilty of the murder. Hence, were this instruction insufficient, no error prejudicial to the defendant has been committed. *State v. Pratt*, 98 Mo. 482.

SHERWOOD, J.—The defendant was indicted at the January term, 1889, of the circuit court of Audrain county for murder in the first degree, for shooting and killing one Samuel Apgar, in said county on the seventeenth day of April, 1888.

The indictment contained four counts. The first count charged murder in the first degree, by shooting and killing with a pistol, in the usual, formal and general manner; the second and third counts charged murder in the first degree, committed in the attempt to perpetrate a burglary; and the fourth count charged George Mortimer with the commission of the offense in perpetrating a burglary, and defendant as being an accessory after the fact. He waived formal arraignment and pleaded not guilty, and at the June term, 1889, of said court, was tried and found guilty; the jury returning a verdict of guilty of murder in the first degree. Thereupon he filed his motion for a new trial,

which was continued until July, when it was overruled and defendant sentenced, from which he appealed to this court.   At the close of the evidence on the part of the state, the state entered a *nolle* as to the fourth count of the indictment, and this was done over the objection of the defendant.

At the time defendant was indicted, George Mortimer was also separately indicted for the same offense. Apgar was an old man about sixty-five years old, and lived with his wife in a house that fronts south, and on the same street, about six blocks west of the house which had been for a few weeks occupied by both Miller and Mortimer, with their wives.   Miller and Mortimer, before moving to this place, occupied a house together in a different part of the town, and Miller conducted a sort of barber shop in both of these houses. Apgar's house consisted of four rooms and a summer kitchen, which was connected with the northwest room of the main house by a platform.   This northwest room had a door in the west through which one passed onto the platform, which was three or four feet wide, and on into the east door of the summer kitchen.   A door was between this northwest room and the southwest rooms of the house ; and, on the night of the murder, Apgar had gone to bed with his wife in the southwest room. A day or two before the murder the summer kitchen had been brought into use, and at night, when Mrs. Apgar retired, the summer kitchen door was fastened and the drawers in the safe were in their places.   Just immediately after the murder the doors of the northwest room and the summer kitchen were open, and the drawers of the safe in the kitchen pulled out and things in it disarranged, besides other things in the kitchen were removed and disarranged.

About two o'clock in the night Mrs. Apgar heard a pistol shot in the north room and a door slam.   Immediately her husband returned into the room and said : "I

am shot." Presumably he had heard a noise and gone out to ascertain what it was, and in doing so met with the burglar, who shot him. Apgar was shot with a number twenty-two pistol, and a pistol of that size was found partly burned in Miller's stove, and cartridges, of the same kind and size as those which would fit the pistol found in Mortimer's possession, on his person ; and the pistol was proven and admitted to be his and the ball taken from Apgar's body exactly fitted the empty cartridges found in Mortimer's pistol. Three or four cartridges of the same kind were found in a box on Miller's work bench in the northwest room of the house in which he and his wife stayed ; though that room was the common passway to the kitchen, Miller and his wife and child had a bed in the northwest room, and Mortimer, wife and child the southeast corner room, and both families lived in common ; the respective heads of each alternating in furnishing provisions. The trial resulted in Miller being found guilty of murder in the first degree, hence his appeal.

Miller and Mortimer lived together in a house with four rooms in it. It fronted east and had one east front door. Passing in that door, you come into the northeast room; from that room you pass into a room directly south, with no outside door; also from that northeast room you pass into a room just west, and from that room into a kitchen south, being the southwest room of the house, which room had a door leading west onto the outside. These rooms were all used in common by both Mortimer and Miller. There were no outside doors to this house but the one in the east and the one leading from the kitchen in the west. Apgar was an ex-Federal soldier and drew a pension, and this fact was known to Miller, who had spoken of it and had expressed ill-will against Apgar. The wife of Mortimer was introduced as a witness on the part of the state, as was also Mortimer himself.

The testimony introduced was substantially as follows:

Mrs. Apgar, the wife of the deceased, testified: "I live now in St. Louis; before I went to St. Louis I lived in West Mexico; I have lived there seven or eight years; my husband's name was Samuel Apgar; the house we lived in had three rooms, sixteen feet square, and one about twelve feet; it was on the north side and stood back from the street about twelve feet, maybe a little further; my husband's death occurred on the seventeenth day of April, 1888, in Audrain county, Missouri; the first to attract my attention was a pistol shot; I was in the west sitting room; there was a dining room north of that; it was a very small room; there was a passage from the room I was in to the dining room; my husband and I were sleeping that night in the west room, south of this dining room; the bed was in the west corner of the room, the head extending west; it stood against the wall next to the dining room; there was a small kitchen located about four feet from the dining room; there was a door which led out of the dining room west; there was nothing but a platform between the dining room and kitchen; it had no roof over it; it was just four feet from the west door of the dining room to the summer kitchen door; the door in the summer kitchen faced east; there was a safe in the summer kitchen; Mr. Apgar went to bed early that night; I closed all the doors that night; the door to the summer kitchen was closed with a bolt; the front gate was closed; the report of a pistol woke me up that night; I was in bed; the report sounded to me as if it was north of the dining room door; I heard the door slam against the safe and the dishes rattle; my husband came in soon thereafter and told me he was shot; he came in and got his pistol to go out, and he just stood there, and I went out to make the alarm, and when I came back he was dead; he knelt down at the foot of the bed with his left hand at the

bed post, he did not live more than two and a half minutes after he was shot; the drawers and doors of the safe were shut that night when I left them; the next morning they were pulled out and the things in the drawers were stirred around.

"Mr. Apgar went to bed that night about seven o'clock; he was old, infirm and sickly; he had been down town that day; he always kept a pistol, and slept with it; it was one of these big ones; I did not hear him when he got up; he always got up at that hour to take his medicine, had for years; he had nothing when he came in, but he came to get his pistol, and I would not let him; he was in the dining room when I heard the pistol shot; it was a dark night—no moon shining; this occurred between two and three o'clock in the morning. My husband had $5.25 when he was killed; he was drawing a pension every three months; he applied for it on the fourth day of March, in a couple of days after a voucher was sent in."

Jacob Flora testified: "In April, 1888, I lived directly across the street from Apgar; the night of Apgar's death my wife woke me up and said some one was hallooing, and I went to the door and looked across the street and saw Mrs. Apgar, and she was hallooing for Mr. Lawler, a man who lived in the second house from me, almost directly across the street from her; I went there, saw Mr. Apgar on the floor—halfway sitting and laying—holding to the foot of the bed; I spoke to him; he didn't speak, but shook his head, and I picked him up and put him in bed; he gasped once, and I laid him down and ran to Surber's and told him to go and stay with Mrs. Apgar while I went for Dr. Fritts or Murdock; I went back and found him dead; blood was running out of his mouth, and there were blood stains on his breast from a bullet hole either on the right or left side of his breast; this was about two o'clock, I think."

Andrew Surber testified : "Live about one hundred and fifty or two hundred yards from Apgar's ; Mr. Flora came to my house and woke me up and told me to go there ; when I got there Apgar was lying on the bed dead ; he had a bullet hole in his right breast, and the blood was oozing out of this hole; this was between two and three o'clock in the morning ( he describes the rooms in the buildings) ; in the summer kitchen was a safe, the drawer in which was pulled pretty near out ; the door of the dining room was open when I got there.   Saw Apgar's pistol ; it had not been fired off that night."

Dr. E. S. Cave testified :   "Saw Apgar about three o'clock the morning he was killed ; he was dead ; had a bullet hole in the breast; the bullet severed one of the pulmonary veins, which would cause death by bleeding within a very short time ; extracted the ball ;   the ball was what we call a twenty-two for a pistol; I afterward tried it in a twenty-two pistol and in a twenty-two cartridge, and it fit both.  ( Pistol shown him which he says he fit ball in.)   Pistol was handed me by Botkins or Potts ; looks like it had been burnt; I kept the pistol a year, perhaps, and gave it to the prosecuting attorney."

Richard Ball testified :   "I knew defendant in April, 1888 ; he and George Mortimer lived together; defendant was a barber ; I was at his place the last time, either the last of March or first of April, 1888 ; I had a talk with defendant about shaving ; he said he was not in good order, didn't feel well ; and I think likely I spoke to him something about his pension papers ; he said there is Apgar, an old scoundrel, and he is drawing a pension as a Union man, and that he was no more a Union man than any other rebel was ; that he ought to be killed ; he said Apgar was drawing it every three months."

Joseph Botkins testified :   "Defendant lived about five or six blocks from Apgar's, at the time of the

killing, and at the time of defendant's arrest (describes Miller's house) John Miller and his wife and child, and George Mortimer and his.wife were living there ; in the morning after Miller's arrest (I don't know whether I happened in the calaboose or whether he sent for me), but we got into a conversation, and he asked me to send for Hamilton Hall to go on his bond ; that he and Warren McIntire had said if he got two others to go on the bond he would go with them ; that brought up the murder, and I told him if he would furnish me the name of the man that killed Apgar I would see that he was bailed out ; then after that Miller wanted to see Mortimer's wife ; I proposed to go down and bring her up ; he said he would rather see her at the house ; I returned again a time or two during the afternoon ; I talked of bringing her up, and he said he would rather see her at the house ; then I got permission to go down with him, and he and I and Joe Pratt went together, but before we got there we saw the woman at another house ; before we got to the house he said to Mortimer's wife : 'Mr. Mortimer told me to tell you to let me have your pistol.' Mrs. Mortimer said : 'Mr. Mortimer has not got a pistol here ;' it was repeated a time or two by Miller, that Mortimer had said, give the revolver to me, and she let on to get mad about it ; then Miller says : 'Well, give him what there is left of it ;' then she turned and beckoned to me to come on, and went to the kitchen and turned the lids off the stove and took the stove-hook and grabbled out of the ashes a revolver ( revolver produced and shown witness ) ; that was what she scratched out of the fire ; it was red hot when she scratched it out ; we found some cartridges, in some of Miller's boxes, the same size of the cylinder of that pistol ; they call the pistol a twenty-two in size ; on returning, Miller demanded his liberty on showing the pistol ; I said, I believe you have found the pistol that did the killing, now find the man ; and that ended

the matter, so far as that was concerned; but he insisted on being bailed, and let me guess at the balance. When I told him I would bail him out if he would point out Apgar's murderer he wanted to see Mortimer's wife, and I think he said he thought perhaps he could point me to the man; he wanted to see her first; that is my recollection.''

Joe Pratt testified: ''Remember of going with Mr. Botkins and defendant to defendant's house (pistol shown witness and identified as the one recovered at that time); we were going down there but I didn't know what they were going for, and Botkins told me we were going to get Miller's pistol; I didn't hear the first conversation when we got in; when I got in Miller said to Mortimer's wife: 'Get that thing for these gentlemen.' She said: 'I don't know what you mean.' He said: 'Yes, you do;' and she said: 'You are making me out a liar before these men;' and then, afterward, she said: 'All right, come ahead,' and then scratched in the stove and found this pistol. (As to finding cartridges and the size of them and the size of the pistol, his testimony was the same as Botkins'.) There were two empty shells in the pistol when we found it. The shells in the pistol were twenty-two brand, with a 'U' on the end of it, and were long.''

Mattie Mortimer testified: ''I am the wife of George Mortimer, who is indicted for the homicide; I live in St. Louis now; lived at Miller's in this town in April, 1888; we all lived and ate together, except that I had a separate sleeping room; Miller rented the house; we were living there when Apgar was killed, and when Miller was arrested (pistol shown witness and recognized); saw the pistol before we moved to the place; saw it the evening Miller told me to put the pistol in the stove the Friday night after my husband was arrested; my husband was arrested on Friday evening; I put it in the stove; it had a wooden handle on

it and one load in it, and after I put it in it went off; after I put it in the stove he told me not to tell he had anything to do with it; when he gave me that pistol he got it from the privy; I put it there; he told me to put them in the privy; that was on Friday night; he said they would be down there to search, and he wanted me to put them in the privy, and he went down town and then came back and told me to go and get them and bring them in, and then he went down and buried them, except that, and he told me to burn it, and then went and took the other things up and told me to burn those; the next morning after Apgar's death, heard Miller talking in the room to Mortimer; he said: 'Last night was the first night I ever had my shoes off, and then I stepped on the carpet that had just been put down, and it made a fuss and they heard me.' I remember when Botkins came there with Miller, Miller said to me: 'Mattie, George sent me down here for that pistol,' and I said: 'I have not got it,' and he said: 'He told me to tell you to get it,' and I said: 'You know where it is,' and he says: 'Well,' and started in, and I went in and didn't get it out, but Botkins did himself, and it was hot; there was an alarm bell in that house at the east bed room window; it was put on the window and a string to it and a hole in it to pull it; the string went on the outside; Miller directed it put there; he said, put it there to wake me up, because I was so hard to wake; it was put there after Apgar was killed, and the same week Mortimer and Miller were arrested."

James Marshall testified: "I was on the police force; went to the house of Miller and Mortimer and arrested Mortimer in the evening before the morning of Miller's arrest; after I arrested Mortimer, on the same evening I went back and searched the house; I found some twenty-two cartridges on Mortimer, and asked Miller for the twenty-two calibre pistol, and he said there was

none there; I found a larger pistol there, and he said that was the only pistol on the place. When I went to the house to arrest Mortimer, I knocked on the front door, and Miller came to the door, and I called for Mortimer, and he said he was there; I heard a noise at the back part of the house, looked and saw Mortimer go out of the south door of the kitchen and make for the fence; I hallooed to him to halt, and he stopped and came back. There are two kinds of twenty-two cartridges—a long and a short; the cartridges found in the possession of Mortimer were long; the cylinder of the pistol offered in evidence is for a long cartridge."

Warner Potts testified : "A few days after Miller and Mortimer were arrested, I heard a conversation between them at the jail; each accused the other; Mortimer said Miller was with him, and Miller denied it; and Miller said to Mortimer : 'You know, you scoundrel, you killed that old man. Didn't you hide behind that box in the kitchen and kill that old man?' and Mortimer said he didn't know there was a safe or box in the kitchen; they argued the question between themselves, and I made them talk one at a time, and Miller said he didn't go with him."

George Mortimer testified : "Miller and I were living together in the same house; he had three rooms and I had one; I remember that Aggar was killed; I learned he was killed; I was at Apgar's gate at the time; Miller and I went up there together; I had been in bed and I suppose Miller had; we started out, just to be going out, about twelve o'clock; we walked west up the street; when I stopped at the gate Miller walked inside the yard; I heard a pistol shot in the house ; Apgar's house was north of me; after I heard the shot I saw Miller coming from around the house; he did not say anything when he came round; he went down the street then; we went home together, not saying anything on the way (the twenty-two calibre pistol referred to

before shown witness, and he said it was his); I did not have a pistol with me that night; saw this pistol lying on the bureau in Miller's room the next morning; soon after the pistol shot was fired saw Miller come round the corner of the house; when he came round he was running rapidly; when he came to the gate, we went home together, and went in at the kitchen and went to bed; we did not talk of our purposes and plans before we went up to Apgar's house that night, nor as we were going up there, nor on our return home, nor afterwards did we talk of Apgar's murder; nor did Miller tell me of his purpose in going up there; nor did I have any purpose in going with him; nor do I know what purpose Miller had that night in going up there."

This witness also testified that on that very afternoon which he testified, that he had negotiated with the state to *testify against Miller*, and upon his agreeing to do so the state agreed to accept and did accept a plea from him of murder in the second degree on a separate indictment then pending against him for the murder. And the state also made the further agreement that, in consideration that the witness would thus testify against Miller, that the state would *nolle* several other indictments then pending in the same court against the witness.

On cross-examination this witness was also asked if he had not been in the penitentiary two or three times, but this question the court refused to permit the witness to answer, for the reason that "*a conviction must be proven by the record.*" He also admitted that he had caused several men to be arrested and put in jail on his representations concerning their guilt of the murder, and that such representations he knew were false. At this juncture the state moved for permission to enter a *nolle* as to the fourth count in the indictment, and over the objection of the defendant this was permitted to be done.

At the close of the testimony several instructions, such as are usually given in cases of this sort, were given to the jury. Such of them as require special mention will be noticed hereafter.

After argument the jury were sent out to consider of their verdict, and remained in consultation for six hours, and came into open court and were inquired of by the court if they had agreed, and it was answered that they had not and were not likely to; and, being inquired of by the court as to the obstacle in the way of an agreement, one of the jury reported that some members of the jury did not believe from the evidence in the case that defendant Miller personally shot and killed the deceased Apgar, and they wished to know if they could convict defendant if he had aided and assisted, etc., said Mortimer in his killing said Apgar. And thereupon the court gave the following further instruction to the jury :

"Although the jury may believe from the evidence in the cause that George Mortimer fired the fatal shot that killed said Apgar, yet if they believe that defendant was present aiding, abetting, helping, comforting and assisting the said Mortimer in such killing then defendant is guilty of murder in the first degree equally with said Mortimer, provided that said Mortimer fired said fatal shot and killed said Apgar wilfully, deliberately, premeditatedly and of his malice aforethought, or in the perpetration or attempt to perpetrate a burglary, as defined and explained in other instructions." Exceptions were duly saved by the defendant to giving such additional instruction.

These matters have been stated thus at large, because it is claimed here, as it was in the lower court, in the motion for a new trial, that there was no evidence to warrant the conviction of the defendant, and because such statement will enable our rulings of law upon the facts as set forth, to be more readily understood.

I.   There was error committed by the trial court in permitting the prosecuting attorney, after the testimony was closed, to dismiss the fourth count of the indictment, such dismissal including not only the charge against Mortimer as principal in the murder, but also the defendant Miller as accessory after the fact.   There was testimony which tended to show that the defendant was guilty of being such accessory, and it should not have been withdrawn from the jury as it was by the course pursued by the prosecuting attorney, with the permission of the court and over the defendant's objections.

II.   The same line of remark applies to the action of the court in giving the first instruction for the state, which told the jury that, "under the evidence in this case, they must find the defendant guilty of murder in the first degree or acquit him;" and that the fourth count in the indictment charging the defendant as accessory after the fact had been dismissed and should not be further considered by them.   A trial court where murder is charged in one count of an indictment and there is testimony to sustain it, and one count charging manslaughter in the fourth degree, and there is evidence to sustain it, might, with equal propriety, permit a dismissal of the last count, and instruct the jury to disregard it and to consider only as to the truth of the first count, taken literally.   In the case at bar if there had been no evidence as to the defendant being an accessory after the fact, then the order of dismissal as to the fourth count might well have gone not only as to Mortimer, but also as to the defendant; but, in the circumstances related, such order was erroneous, and the instruction based upon it simply duplicated the previous error.

III.   Was error committed in refusing permission to the defendant to interrogate Mortimer as to whether he had not been in the penitentiary two or three times? In order successfully to ask and have answered such a

question, it seems to be unnecessary to produce a record of conviction. Such record only has to be produced where it is proposed to show that the witness has been convicted of some crime, in which case the judgment of conviction is the only competent evidence. It is otherwise, however, where the question is asked the witness for the purpose of honestly discrediting him; then the question is competent. This is the tendency of adjudication in this country. Wharton's Crim. Ev. [9 Ed.] sec. 474, and cases cited; 1 Bishop's Crim. Proc., sec. 1185.

IV. The sixth instruction given at the instance of the state was the following: "The court further instructs the jury that the testimony of a party aiding, assisting, encouraging and abetting a crime is admissible; yet such evidence, when not corroborated by the testimony of others not implicated in the crime as to matters *material* to the issues, ought to be received with great caution by the jury and they ought to be fully satisfied of its truth before they convict defendant on such testimony." This instruction is almost a literal transcript of an instruction given and condemned in *Chyo Chiagk's case*, 92 Mo. 395, and is faulty, therefore, for the same reasons there mentioned, in that it does not explain to the jury the meaning of the words, "*matters material to the issues*," and in that it fails to tell the jury that in order to the corroboration of the testimony of an accomplice, such corroboration should go to the extent of *identifying the person of the prisoner against whom the accomplice speaks*. The object of the rule, which requires that the testimony in corroboration of that of an accomplice should go to the extent mentioned, is that the danger may be guarded against of an accomplice relating the circumstances of the criminal transaction truly, except that he substitutes the name of the accomplice for his own, thus practising a fraud upon the triers of the issues, as well as upon the prisoner.

Citation has been made of *Walker's case*, 98 Mo., *loc. cit.* 109, as supporting this instruction but it does do so; on the contrary, the instruction in that case is very specific touching the necessity of the corroborating testimony identifying the person of the accused as a guilty participant in the crime charged. Citation is also made of *Pratt's case*, 98 Mo. 482, as showing that even if the instruction was faulty it did not hurt. This rule may well be applied where the testimony is very convincing of a defendant's guilt, so that the testimony of the accomplice may be dispensed with altogether, and still abundant evidence be left for the conviction of the accused; and this was *Pratt's case*, and all that it decides on the point in hand. The evidence in this case does not possess such strong probative force, as to cure or neutralize the error of an instruction, such as was given in the present instance. It must be a very clear case which will enable this court to say that an error of this sort is harmless in the particular circumstances of any given case.

V. There was no error in the second instruction for the state to the effect that if the defendant shot and killed Apgar in the perpetration or the attempt to perpetrate a burglary, that then he was guilty of murder in the first degree. *State v. Hopkirk*, 84 Mo. 278.

VI. It is claimed that error occurred in giving the jury another instruction, the tenth, after they came into court and announced they could not agree, and the point of their difficulty. It is competent to give additional instructions to the jury, when they return into court, and signify the difficulty under which they labor, where this is done in open court as it was here, the counsel for the defendant being present. *State v. Williams*, 69 Mo. 110. It does not, indeed, appear whether the accused was present in this case as in that; but in the absence of any showing to the contrary, if such presence were necessary, it will be presumed that

the trial court did its duty and that the accused was present.

VII. Relative to the instruction itself, it contains no error; it simply announces the familiar doctrine that one aiding and abetting the commission of a murder is as much a principal in the eye of the law, as though his own hand fired the fatal shot; and the indictment may either allege the matter according to the fact, or charge both the participants as principals in the first degree, the act of one being the act of the other. *State v. Anderson*, 89 Mo., *loc. cit.* 333, and cases cited.

VIII. Relative to the conversation overheard by Mrs. Mortimer between her husband and the defendant, she gave the whole conversation between them, and this removes any objection that all of the conversation was not given. Besides, even if a part of a conversation, it was *all she heard*, and the law would not require her to testify to more than that or reject that which she did hear. Wharton's Crim. Ev. [9 Ed.] sec. 688. Considered in and of itself this conversation was of little worth, but when considered in connection with other circumstances already detailed, its tendency was to show that the defendant was a participant in the crime charged. If Mrs. Mortimer testified after her husband had pleaded guilty to the same crime charged against him in another indictment, there can be no question as to her competency as a witness for the state, because the prosecution against her husband was then closed by his plea of guilty in the other case. And there can be no question as to the competency and relevancy of her testimony respecting the conversation she overheard between her husband and the defendant.

IX. Now as to the claim that there is no evidence to support the verdict: The admissions made by Miller in his altercations in prison with Mortimer show a guilty knowledge on his part of the situation at Apgar's house on the fatal night, and that he knew who did the

murderous deed; and his knowledge of the locality of the pistol, that it was concealed in the stove and had been partly consumed by fire, is also pregnant circumstance evincive of guilt. This of course leaves out of consideration any testimony of Mortimer or of his wife. Taking in consideration the facts just related as well as those related by Mrs. Mortimer, there was certainly sufficient testimony to go to the jury as to whether the defendant was guilty, even if the testimony of Mortimer be left out of consideration altogether.

X. Blackstone says: "It hath also been usual for the justices of the peace, by whom any persons charged with felony are committed to jail, to admit some one of their accomplices to become a witness (or, as is generally termed, king's evidence) against his fellows; upon an implied confidence, which the judges of jail delivery have usually countenanced and adopted, that, if such accomplice makes a full and complete discovery of that and of all other felonies to which he is examined by the magistrate, and afterwards gives his evidence without prevarication or fraud, he shall not himself be prosecuted for that or any other previous offense of the same degree." 4 Blackstone's Com. 330.

Mr. Bishop says this is in substance the modern practice. He says, also: "Doubtless, in most cases, the mere fact that an accomplice testifies as a witness for the government, freely and fully acknowledging his own participation in the offense, will constitute an implied agreement, in the absence of an express one, for his exemption from further prosecution. * * * The agreement is, that the accomplice shall disclose all he knows, honestly and fairly, and, if his testimony is corrupt, or if otherwise his disclosures are only partial, he gains nothing, and his confessions may be used against him. But when he has fulfilled the agreement on his part, he is equitably entitled to be no further pursued for his own crime, and equally whether the

party testified against is convicted or acquitted." 1 Bishop's Crim. Proc., sec. 1164.

In the present case the agreement made by the prosecuting attorney with Mortimer was not that the latter would make a complete and full disclosure of the facts within his knowledge respecting the charge then being prosecuted, and of all other felonies, but Mortimer agreed with the prosecuting attorney, that if that official would accept a plea from him of murder in the second degree, and would also *nolle* several other indictments pending against him, that then he would *testify against Miller*.

No such instance as this can be found in the books; and I do not believe that such a bargain as this to *testify against the life of another* should receive any countenance or sanction in a court of justice, or that, in the circumstances mentioned, Mortimer should have been admitted as a witness in the cause.

For the errors heretofore mentioned the judgment should be reversed and the cause remanded. All except BLACK, J., who dissents, concur; RAY, C. J., in the result; BARCLAY, J., specially, and BRACE, J., in the result.

BLACK, J. ( *dissenting* ).—I dissent from the opinion filed in this case, and shall only speak of two matters, and of these only because the facts are not fully stated.

Concede that the court erred in refusing permission to the defendant to interrogate Mortimer as to whether he had not been in the penitentiary two or three times, still no complaint was made of this ruling in the motion for a new trial, and the error is therefore not before us for review. The defendant did complain, in his motion for a new trial, that the court permitted incompetent witnesses to testify and that the court admitted illegal evidence offered by the state; but he made no complaint whatever that the court excluded evidence offered by

himself. The evidence excluded was of no value except as affecting the credit to be given to the witness. It was in substance and effect evidence offered by the defendant, and, as exclusion of evidence offered by him was not made a ground for a new trial, the error in excluding it should not be considered in this court.

I do not understand the opinion before filed in this case to hold that Mortimer was an incompetent witness. He was certainly competent to testify on behalf of the state; for he was not a party to this record. Besides this he entered a plea of guilty before he was called as a witness. It seems to be held that his evidence should have been excluded on the ground that he had made a corrupt contract with the state. The evidence of such a contract, if any there is, is that elicited from Mortimer on cross-examination, and that is this: *Q.* "You were indicted for this murder, were you not, George?" *A.* "Yes, sir." *Q.* "You negotiated with the state to testify and they agreed to let you off from that indictment by a plea of murder in the second degree?" *A.* "Yes, sir." *Q.* "That was an arrangement between you and the state?" *A.* "Yes, sir." *Q.* "You are indicted for several other offenses, are you not, in this court?" *A.* "Yes, sir." *Q.* "Did they agree to let you off from those?" *A.* "Yes, sir." *Q.* "Let you off free from those indictments and take a plea of murder in the second degree, if you would testify against Miller?" *A.* "Yes, sir." *Q.* "And that arrangement was made this afternoon in the court house, was it?" *A.* "Yes, sir."

I fail to discover anything in this evidence which shows, or has the least tendency to show, that the agreement was that the witness should testify to anything other than the truth, the whole truth and nothing but the truth. In my judgment a conclusion that this witness was not to make a full and complete disclosure is simply a play upon the words "negotiate" and "testify against Miller"— words which were put into the mouth

of the witness by counsel who cross-examined him. This is but the ordinary case of an accomplice testifying against a confederate in the commission of a crime, and it is to hoped the time has not arrived in the criminal jurisprudence of this state when such evidence is to be excluded. There is certainly nothing in the extracts made from Bishop and Blackstone which gives any support to the proposition.

There can be no doubt but these two men, defendant and Mortimer, murdered old man Apgar, and I see no error in the record before us, and the judgment should be affirmed.