THE STATE v. LONG, Appellant.

**Division Two, March 5, 1907.**

1. **INFORMATION: First Degree Murder.** An information charging murder in the first degree, set out in the statement, held sufficient.

2. ——: ——: **Use of Word "With."** The unneccessary use ol of the word "with" in connection with the words "a certain shot gun then and there charged," etc., in an information for first degree murder, did not render the information bad, nor prejudice any substantial right of the defendant.

3. **STATEMENT BY DEFENDANT: Self-Serving:   Res Gestae.** Self-serving statements of defendant, after the shooting, as to why he shot the deceased, which were in no sense a part of the *res gestae*, were properly excluded.

4. **WITNESS: Impeachment: Commission of Crime: Failure to Claim Exemption.** A witness for defendant was asked, on cross-examination, if prior thereto he had not committed a detestable crime; the witness himself made no claim of privilege, and when the court overruled defendant's objection, the witness promptly denied the charge. *Held*, that the mere asking of the question was not error.

5. INSTRUCTION: Defining Phrases. A failure to define the phrases "provoked the difficulty" and "began the quarrel," employed in an instruction, was not error, since those phrases are self-explanatory.

6. JUROR: Impeaching Verdict: Misconduct. Jurors cannot impeach the validity of their verdict by testifying to their own misconduct—the alleged misconduct in this case being the arriving at a verdict by drawing slips of paper from a box.

7. MURDER, FIRST DEGREE: Sufficiency of Evidence. Evidence held ample to support the verdict finding defendant guilty of murder in the first degree.

Appeal from Pemiscot Circuit Court.—*Hon Henry C. Riley*, Judge.

AFFIRMED.

*Pierce & Reeves* for appellant.

(1) The information is defective because it fails to state that the mortal wound was inflicted feloniously, wilfully, deliberately, premeditatedly, on purpose, and of malice aforethought. State v. Johnson, 90 S. W. 89; State v. Woodard, 90 S. W. 90. (2) The circuit court erred in permitting the prosecuting attorney, over the objection and exception of defendant, to ask defendant's witness Winsett if he had not committed a detestable crime. This is certainly not the proper way to impeach the credibility of a witness, and we take it that the question is no longer an open one in this State since the decision by this court in the case of State v. Wigger, 93 S. W. 390; State v. Howard, 102 Mo. 148. (3) The court erred in giving instruction 3 without defining in that or some other instruction the meaning of the words "provoked the difficulty" and "began the quarrel." (4) This cause should be reversed for the further reason that the verdict returned by the jury convicting defendant was a gambling or chance verdict. Without objection on the part of the State the affidavit of Geo. A. Lamb was admitted as evidence to sustain the motion

for a new trial. This affidavit conclusively shows the chance or gambling character of the verdict. We submit that the manner and conduct of the jury in arriving at their verdict was most reprehensible, and for this misconduct the verdict ought to have been set aside by the circuit court and a new trial granted.

*Herbert S. Hadley*, Attorney-General, and *Frank Blake*, Assistant Attorney-General, for the State.

(1) The information is sufficient. The words "feloniously," etc., run through all subsequent allegations where the words "then and there" are used and connect them with the mortal stroke. State v. Williams, 184 Mo. 261; State v. Woodward, 191 Mo. 629. (2) There is abundant authority sustaining the court in permitting the prosecuting attorney, on cross-examination of the witness Winsett, to ask him whether or not, in the month of May, 1905, he committed a certain detestable crime. Wherever such a question is asked, however, the State is concluded by the answer. 2 Wigmore on Evid. sec. 981, p. 1108; Muller v. St. L. Hospital Ass'n, 5 Mo. App. 401, 73 Mo. 242; State v. Hack, 118 Mo. 92; State v. Taylor, 118 Mo. 159; State v. Miller, 100 Mo. 606; State v. Heusack, 189 Mo. 312; Newcomb v. Griswold, 24 N. Y. 299; People v. Jackson, 3 Park. Cr. 395; Oxier v. United States, 38 S. W. 331. Since an unfavorable answer was received the tendency of the question was to injure the State and establish the fact that the witness was not guilty of such a crime. State v. Heusack, 189 Mo. 312. (3) It is not necessary to define the terms "provoke the difficulty," or "began the quarrel," or "bringing on the difficulty." They are self-explanatory. Besides, no request was made by the defendant to instruct concerning these terms, and no exception saved on account of the failure of the court to instruct thereon. State v. Sharp, 183 Mo. 715; State v. Bailey, 190 Mo. 291. (4)

On motion for a new trial, affidavits and testimony of jurors going to impeach the validity of their verdict, on the ground of their own misconduct, are not admissible. Jurors speak through their verdicts, and they cannot be allowed to violate the secrets of the jury room or disclose the methods which operated to produce the verdict. State v. Coupenhaver, 39 Mo. 430; State v. Underwood, 57 Mo. 40; State v. Branstetter, 65 Mo. 156; State v. Dunn, 80 Mo. 694; State v. Cooper, 85 Mo. 261; State v. Rush, 95 Mo. 205; State v. Wood, 124 Mo. 417.

GANTT, J.—On October 3, 1905, the prosecuting attorney of Pemiscot county filed an information charging the defendant with murder in the first degree of one C. C. Still, on the first day of October, 1905. The defendant was duly arraigned on the 22nd day of November, 1905, and a plea of not guilty entered. A trial was had on the 24th of November, 1905, and the jury returned a verdict of murder in the first degree. The defendant was sentenced according to the verdict and from that sentence has prosecuted his appeal in due form. The information, omitting caption, is in the following words:

"State of Missouri v. Dave Long.

"L. L. Collins, prosecuting attorney within and for the county of Pemiscot, in the State of Missouri, upon his official oath informs the court, that Dave Long, late of the county of Pemiscot and State of Missouri, at and in the county of Pemiscot and State of Missouri, on the 1st day of October, 1905, did then and there in and upon the body of one C. C. Still then and there being, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought make an assault, and that the said Dave Long with a certain shot gun then and there charged with gunpowder and leaden bullets, which said shot gun he, the said Dave Long, in

his hands, then and there had and held, then and there. feloniously, wilfully, deliberately, premeditatedly, and of his malice aforethought did discharge and shoot off, to, against and upon the said C. C. Still, and that the said Dave Long, with the leaden bullets aforesaid, out of the shot gun aforesaid, then and there, by force of the gunpowder aforesaid, by the said Dave Long discharged and shot off as aforesaid, then and there feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought did strike, penetrate and wound the said C. C. Still, in and upon the abdomen and near the navel of him, the said C. C. Still, giving to him, the said C. C. Still, then and there, with the leaden bullets aforesaid, so as aforesaid discharged and shot out of the shot gun aforesaid by the said Dave Long in and upon the abdomen and near the navel of him the said C. C. Still, one mortal wound of the depth of eight inches and of the width of three inches, of which said mortal wound he the said C. C. Still then and there instantly died.

"And so L. L. Collins, prosecuting attorney as aforesaid, upon his official oath as aforesaid, doth say that the said Dave Long him the said C. C. Still, in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought did kill and murder, against the peace and dignity of the State.

"L. L. COLLINS.

"L. L. Collins, prosecuting attorney, makes oath and says that the facts stated in the above and foregoing information are true according to his best knowledge, information and belief.

"L. L. COLLINS.

"Subscribed and sworn to before me this, the 3rd day of October, 1905.

"J. W. GREEN,
"Clerk of the Circuit Court."

The testimony tended to develop the following facts: The deceased, C. C. Still, and the defendant, Dave Long, lived on adjoining premises in the suburbs of a town named Steele in Pemiscot county, Missouri, their houses being about one hundred and fifty yards apart and separated by a fence and a barn. On Sunday, October 1, 1905, at six o'clock in the morning, the deceased was out in his yard milking his cow, and the defendant was in his own yard. For some six months previous to this time, a bad state of feeling existed between these two, growing out of the fact that the defendant's pigs would wander over the premises of the deceased and the defendant claimed that the deceased was constantly abusing and chunking them. Many threats were made by the defendant against the deceased. Ben Adams testified that about a week or two before the homicide, the defendant was talking about the deceased killing his hogs and clubbing them, and said he had been aggravated enough about it, and he would rather shoot his (deceased's) heart out than to eat chicken pie. Wesley Earp testified that along in May, 1905, he and the defendant were talking about some hay the deceased had thrown over in his cow lot, and defendant said, "I am going to kill the G-d-son of a b-, he has been bothering me all spring, and I will kill him before the year is out." Witness said to him that that was wrong, and would get him into trouble, and he said he did not care if it did. On the other hand, Winsett, a brother-in-law of the defendant, and the defendant's son and the defendant himself, testified to threats by the deceased; Winsett stated that early on the morning of the difficulty, the defendant spoke to the deceased in a modest, low tone of voice, and told the deceased that it looked like he (the deceased) was determined that defendant should not raise any stock of pigs, and to this the deceased replied, "All right, I will blow your G— d— brains out before the sun goes down." The son

testified that at the time of the killing of the deceased,
the defendant, who was walking out in the road with
a shot gun, told deceased that he was ready to settle
their difficulty and deceased replied, "All right, I am
going to blow your G-d- brains out," at the same time
running his hand into his pocket and continued to walk
along. The defendant testified in his own behalf and
stated that deceased bothered his (defendant's) hogs
and would beat them when they got into his yard, he
told him to keep them out, and I said keep your gate
shut and they will not bother you; that was in April.
The trouble over the stock continued and was renewed
about once a month. I then fixed the fence pig proof
and afterwards took a plow and threw the dirt against
the fence to keep the hogs from getting under it. I
could not say for certain that the deceased killed any
of my hogs. One was thrown over in my lot, and it
must have been thrown there for I have never seen a
hog with wings yet; this was about a month before the
killing. Deceased made an effort to fix the fence. Early
on the morning of the difficulty, I saw the deceased
with a claw hammer after a pig and I said to him,
"It seems you do not intend for me to raise or have
anything to support my family with." He pushed the
gate wide open and said, "G— d— you, I will kill you
before the sun sets," and raised his right hand with the
hammer and waved it in the air. I replied, maybe you
will, and walked off. I thought he would carry out his
threats. One day when I was in the barn, a gun was
fired, and the shot came within a foot and a half of me.
I did not know what the deceased shot in the barn for;
this was a month or six weeks before the killing. At
the time of the difficulty, I went out to where he was
armed to protect myself and my family, I went out to
have some decision about the thing and to settle it.
Along about the time dinner was ready, I saw the de-
ceased coming somewhere about the corner of the fence.

Deceased was walking down the road from town towards his home, and I just picked up my gun and stepped out in the yard and across the fence, going kind of meeting him, and said to him, I would like to have that difficulty settled, and he just remarked—he never stopped entirely—"G— d— you, you raise your hand and I will blow your brains out." He fell with his hand in his pocket; I shot for protection. I did not tell Goff that I had done what I intended to do; when he asked me about the killing, I said, "You will find out when I have to tell it." I did not tell Wallace that I had done what I intended to do. Some six witnesses testified to the good reputation of the defendant for peace and quietude and for truth and veracity.

On the part of the State, Ira Wade testified that he was a young man about twenty-one years of age, and was living at the defendant's house at the time of the homicide and saw the defendant kill the deceased with a shot gun on Sunday, October 1, 1905, between ten and eleven o'clock that morning. At six o'clock that morning they had had the trouble. Witness heard the defendant tell the deceased that anybody that would do a fellow's hogs that way would slip around and shoot him after night. They were in a racket after this racket. I saw the defendant in the house getting his gun, but he did not use it then because his wife and I and his brother-in-law got him out of the notion. When the killing occurred I was behind the deceased about thirty yards, and the killing occurred in front of defendant's house. When killed, the deceased was in his shirt sleeves; he was going towards his home, going up the road by the defendant's house; he was on the side of the road next to defendant's fence, but near to the middle of the road. At the time he was shot, the deceased's hands were just swinging along, and when the defendant went to shoot, it looked like he threw them up this way. I was behind

the deceased and could see his hands. Henry Williams also saw the shooting; he was eight or ten steps behind me; deceased's back was towards us and the defendant's face was towards us. I saw the defendant coming out of his house with his gun and coming over the fence. He has a gate and steps at his fence; he was getting over some steps there. Deceased was walking down the road towards his home; defendant was looking at the deceased, and said something to him, and the deceased said something back, whereupon defendant threw up his gun and shot. Before he shot, the defendant walked about six steps before he stopped. When deceased was shot he cried out, "Oh, Lordy!" and fell instantly. The motion he made with his hands was made after he was shot, and that was the first movement he made with his hands. I did not see any weapon on the deceased; I saw him searched and he had only a little pocket knife. Deceased was wounded in the top of his stomach.

Henry Williams corroborated the testimony of Wade, and in addition testified that after the defendant shot the deceased, he took his gun and walked back into his house and then came outside again and said, "You boys turn him around down the road." Defendant then went down towards town a little ways and hollowed, "Come up, men, I have killed a man." I was about fifty yards from the deceased when he was killed. Ira Wade was in front of me on the road; the deceased was walking along towards his home right in the road. The defendant was not over twenty feet from the deceased at the time of the shooting. Defendant said something to him, but I could not tell what it was. Deceased made no motion with his hands at all until after he was shot. The defendant was cool, not excited. The deceased did not put his right hand in his pocket just before he was shot; his hands were swinging down by his side up to the time he was killed.

A. L. Goff testified that he arrested the defendant and asked him, what does this mean, and defendant said, "Well, we just had hell all summer and I got my load and went out there to kill the G-d- son of a b-, and I did exactly what I aimed to do, and would do it again if it should turn just as it has turned." The defendant said he wanted to eat his fish before he was locked up, and I let him eat his fish.

Macklin testified that about nine or ten o'clock on the morning of the homicide, he saw the deceased passing by defendant's house, with Joe Anderson, on his way to the store. Witness said to defendant, "Catch your horse, I am going to take you off this morning;" defendant said no, "hell's in me this morning," and witness said, "Hasn't it always been in you?" and he said, "Yes, a little." After deceased had gone, defendant said, "That man threatened to kill me this morning before the sun went down, and he has got to do it." I said, "Don't think of that trouble; think of your wife and children," but he said, "I have stood as much of it as I can, I have got my gun standing right there for that purpose, and I would have killed him as he went down if it had not been for you and Anderson. I will get him as he comes back."

The foregoing is a synopsis of the principal evidence in the case. Other facts will be noted in the course of the opinion as occasion may require.

I. Various grounds are assigned for the reversal of the judgment and they will be examined in the order of the defendant's brief. The information is entirely sufficient. In all essentials it is identical with the indictment which was approved by this court in State v. Wilson, 172 Mo. 420, and State v. Gray, 172 Mo. l. c. 434. The pleader in this case, it is true, used the unnecessary word "with" in connection with the words "a certain shot gun then and there charged," etc. It was pointed out, however, in State v. Wilson, 172 Mo.

428, that the use of the word "with" in this connection did not render the indictment bad, but was a needless insertion, which did not prejudice any substantial right of the defendant. [State v. Turlington, 102 Mo. 651.]

II. It is urged that the court erred in excluding the evidence of Mrs. S. M. Foster and James Foster, as to certain statements made to them by the defendant, after the shooting, as to why the defendant shot the deceased. The court very properly refused to let this self-serving statement of the defendant go to the jury. It was in no sense a part of the *res gestae*.

III. It is assigned as error that the circuit court erred in permitting the prosecuting attorney to ask Silas Winsett, a witness for the defendant, on his cross-examination, if he had not in the month of May, 1905, committed a detestable crime. When the question was asked, the witness himself made no claim of privilege, and when the court overruled the defendant's objection, the witness promptly denied the charge. There can be no doubt that, under the decisions of this court, the State was concluded by the witness's answer, and indeed no effort was made to show anything to the contrary. But the contention here is that notwithstanding the witness promptly denied the disgraceful matter, and notwithstanding the State was concluded by the witness's answer, it is insisted that the very fact of permitting such a question to be asked was erroneous, and we are referred to State v. Wigger, 196 Mo. 90. This case, however, has no application to the question here presented. It was ruled in State v. Wigger that it was not allowable for the prosecuting attorney to ask a witness for the defendant whether he had been charged with a crime, or whether an information or indictment had been preferred against him. There is an obvious distinction between asking one if he had been charged with a crime and asking if he had committed an offense.

The point presented by the defendant is not a new one. In Muller v. St. Louis Hospital Assn., 5 Mo. App. l. c. 401, the rule as announced in Stephen's Digest on the Law of Evidence, 123, as follows: " 'When a witness is cross-examined, he may, in addition to the questions hereinbefore referred to, be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except,' where the answer might expose him to a criminal charge," was adopted by that court and on appeal to this court, the opinion of the court of appeals was reaffirmed. [73 Mo. 242.] This rule had been followed in State v. Grant, 79 Mo. 113; State v. Miller, 100 Mo. 606; State v. Hack, 118 Mo. l. c. 99; State v. Taylor, 118 Mo. l. c. 159, 160, and cases there cited. The better doctrine would seem to be that, while such questions may be asked the witness on cross-examination, it is a matter largely within the discretion of the court before whom the case is to be tried. Had the witness in this case claimed his own exemption on the ground that his answer thereto might tend to incriminate him, unquestionably he should have been excused from answering it. He asked no exemption and promptly answered the question, and the authorities cited show that it was not error to permit the question to be asked.

IV. The third instruction given in behalf of the State was as follows: "The court instructs the jury that if you believe from the evidence that the defendant provoked a difficulty or began the quarrel with the purpose of taking advantage of Still, the deceased, and of taking his life, or doing him some great bodily harm, then there is no self-defense in the case, however imminent the peril of the defendant may have become or appeared to him in consequence of an attack made upon

him by Still; and if in such circumstances the jury believe the defendant shot and killed Still, then the defendant is guilty of murder in the first degree and the jury should so find." It is insisted that the court should have defined the phrases "provoked the difficulty" and "began the quarrel," in this instruction. We think there is no merit in this contention. This language is self-explanatory and an attempt at definition would have simply tended to obscure language which every man of good sense and competent to sit on a jury understands without any further explanation.

V. Complaint is also made of the sixth instruction, but that instruction is not open to the objections urged against it, and was exceedingly liberal to the defendant. The decision in State v. Gordon, 191 Mo. 114, was based upon entirely different state of facts.

VI. For the reasons already given, the objections to the eleventh instruction given by the court are not tenable.

VII. The twelfth instruction is a correct and exceedingly liberal instruction on the law of self-defense, and nothing which the defendant could have desired or asked, under the evidence in the case, was omitted. The defense was self-defense, and the defendant's own testimony established that he shot and killed the deceased, and there was no issue as to that fact.

VIII. Finally, it is insisted that the court erred in not granting a new trial because the verdict of the jury was the result of misconduct on the part of the jurors in arriving at their verdict, in that they agreed to take forty slips of paper, and mark the figure one on twenty of them, and the figure two, on twenty of them, and place these forty slips in a box and each juror draw one slip therefrom, and if the majority of said slips thus drawn out of the box were marked with

the figure one, then the defendant was to be found guilty of murder in the first degree, and if the majority of said slips were marked with the figure two, then the defendant was to be found guilty of a degree of homicide less than murder in the first degree. To sustain this charge in the motion for new trial, the defendant offered the affidavit of the juror Lamb, and the testimony of another juror. This evidence the circuit court excluded, and unquestionably correctly did so, for the reason that it is the settled law of this State that jurors will not be allowed to impeach the validity of their verdicts by testifying to their own misconduct. [State v. Coupenhaver, 39 Mo. 430; State v. Underwood, 57 Mo. 40; State v. Rush, 95 Mo. 205; State v. Wood, 124 Mo. 417.] After a careful consideration of all the grounds assigned for a reversal of the judgment in this case, we are of the opinion that neither singly nor collectively do they furnish any reason for the reversal of the judgment. The testimony in behalf of the State, and, indeed, we might add that of the defendant, in a large measure, tended to show a willful, deliberate and premeditated murder without any just or lawful provocation whatever, and the verdict of the jury is amply supported and the judgment of the circuit court is affirmed and the sentence which the law pronounces is directed to be carried into execution.

  *Fox, P. J.,* and *Burgess, J.,* concur.