## STATE v. BROTHERTON.

No. 43418.

Supreme Court of Missouri.

Division No. 1.

March 8, 1954.

Rehearing Denied April 12, 1954.

years in the penitentiary. Defendant claims error in refusing to direct verdict for him, in rulings on evidence and instructions, in reprimanding him on the witness stand, and in refusing a new trial on the ground of newly discovered evidence.

Deceased, Ernest Bach, proprietor of Spring Lake Tavern, was shot and killed while standing behind the bar in his tavern in Bollinger County. The only persons on the premises at the time were defendant, who was employed by deceased as a care-taker or janitor, deceased's wife, Mrs. Mary Bach, and Gene Barks, a disabled war veteran, who had been at the tavern most of the day. The shooting occurred about 6:30 P. M. on Sunday, May 4, 1952. However, Mrs. Bach was not in the room where deceased was shot, and did not see the shooting. During the afternoon, there had been other people (estimated as about 25) at the tavern and the small artificial lake on the grounds but all of them had left. Barks testified that deceased and defendant "quarreled around there a little bit" and deceased made defendant leave at the back door. Later he said defendant came back through the front door and deceased insisted that he go back to his cabin. (Defendant lived in a room in the second story of the pump house, 125 feet southeast of the tavern.) Barks said after defendant left, "and was gone just a few minutes, he came back in with a gun in his hand." He said it looked like a single barrel 12 gauge shotgun and that defendant fired when close to deceased without saying anything. Barks went out the back door to his car, parked at the northeast corner of the tavern, and drove to a nearby town to get help. As he did so he saw defendant in the driveway at the southeast corner with the gun in his hand, "in a broke down position." When the sheriff arrived later in the evening he found an expended 12 gauge shotgun shell near this corner of the tavern. The sheriff also took a loaded 12 gauge shell from defendant's pocket when he arrested him. The next day the sheriff found two other loaded shells at a place where defendant was observed to go on the night of the shooting.

R. P. Smith, Cape Girardeau, for appellant.

John M. Dalton, Atty. Gen., Donal D. Guffey, Asst. Atty. Gen., for respondent.

HYDE, Presiding Judge.

Defendant appeals from conviction for second degree murder and sentence of 15

Mrs. Bach testified that before the shooting she heard defendant demand his money (deceased was keeping about $40 for him) and deceased told him he would not give it to him then but would give it to him tomorrow. She said defendant said "all right" and "he run out the door." After defendant left she insisted deceased give him his money and discharge him, but he said the old man was drinking (defendant was 69) and that he would take him to his son's tomorrow and give him his money then. She was on the stairway going upstairs when she heard the shot. After she came back and found deceased, defendant came in the front door and she asked him why he did it, but defendant said: "I didn't hurt him. It was a tall boy with overalls on that has been hanging around here with a shotgun all day." Defendant also told the officers, when they arrived, that after he heard the shot he saw a tall man, a stranger, going out the front door. Later that night he told them "there was nothing to that particular story, that he hadn't seen any mysterious stranger running out the front door at all; he said he had made that up." One witness who talked to defendant when he was in jail testified that defendant said to him: "Gene Barks said I was the fellow who fired the shot" and said "I don't think I did."

Defendant in his own testimony denied that he shot deceased but said that he used a shotgun belonging to Bob Henson that afternoon to hunt some crows he heard in the woods back of the tavern. He said Henson gave him two shells for a drink of wine earlier in the afternoon. (Henson denied that he gave him any shells or got any wine, but he did leave his gun at the pump house.) Defendant said he did not get a shot at the crows but did shoot into a crow's nest and left the gun under the pump house steps. He said, while he was sitting on the porch of the tavern, he heard a shot inside. He admitted that Mrs. Bach accused him of the shooting when he went in, and that he told her about the tall man in overalls. He said he had seen such a tall man earlier and was excited and "had that tall fellow on my mind." He admitted that

at that time "there wasn't anybody there except Gene Barks" and said that he "was addled up." After first denying it, defendant also admitted an argument with deceased about his money and said "he put me out just to quit talking to me." Barks affirmatively answered a question on cross-examination to the effect that defendant held the gun at or near his right shoulder when he fired at deceased. Defendant testified that he always shot from the left shoulder. However, Barks said: "I didn't have time to look at all of those details." Five days after the shooting Henson's gun was found behind a shed 110 feet northeast of the tavern, concealed in a pile of leaves.

Defendant argues Barks' credibility, the improbability of his testimony, discrepancies as to the time element between the time defendant went out of the tavern after the argument with deceased and came back with the gun, the testimony as to the shoulder against which defendant held the gun, and the circumstances under which the gun was found. All of these were jury issues and, taking the view of the evidence most favorable to the State, as we must in deciding this question, it is obvious that the State made a submissible case.

Defendant alleges error in refusing to permit cross-examination of Barks concerning certain absences from his home claimed to have been due either to prolonged drunkenness, blackouts or amnesia, and also in refusing to permit questions to other witnesses about specific instances concerning these same matters, citing State v. Davis, 284 Mo. 695, 225 S.W. 707, 709; State v. Potts, 239 Mo. 403, 144 S.W. 495, 498; State v. Long, 201 Mo. 664, 675, 100 S.W. 587. These cases state the rule, 201 Mo. loc. cit. 675, 100 S.W. loc. cit. 590, that "'When a witness is cross-examined he may, in addition to the questions hereinbefore referred to (concerning commission of a crime), be asked any questions which tend to test his accuracy, veracity, or credibility, or to shake his credit by injuring his character.'" However, in the Long case we also said: "The better doctrine would seem to be that while such questions may be asked

the witness on cross-examination it is a matter largely within the discretion of the court before whom the case is to be tried." This statement was reaffirmed in the Potts case; see also State v. Murrell, Mo.Sup., 169 S.W. 2d 409, 411; State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920, 924; State v. Walton, 255 Mo. 232, 164 S.W. 211. None of these cases are authority for asking other witnesses about remote specific collateral acts of the witness who was cross-examined. See State v. Hewitt, Mo.Sup., 259 S.W. 773, 782; 58 Am.Jur. 345, Secs. 624–625, p. 432, Secs. 783–784; 70 C.J. 638, Sec. 809, p. 764, Sec. 924, p. 804, Sec. 1010. Barks was a veteran of World War II, with 70% disability from a mine explosion in France. Defendant's cross-examination showed that he had been around the tavern, all of the day of the shooting, drinking beer "off and on, not continuously." (Defendant had testimony that Barks was intoxicated in the afternoon of the day of the shooting.) Barks was asked if he had been subject to blackout spells and answered "no". He was then asked if he had gone off on prolonged drinking spells in the last couple of years and been gone several days at a time. He answered: "I went out for a day or two yes." He was then asked about a specific instance concerning a disappearance when he was found at a cemetery. Objection was sustained and defendant made an offer of proof of two other similar incidents. We do not think we can say that the Court abused its discretion in limiting the cross-examination to the general questions and refusing to go into collateral specific incidents, remote from the day of the shooting of deceased. Therefore, these assignments are overruled.

■ Defendant also alleges error in the admission of certain exhibits offered by the State. These exhibits were Henson's shotgun, the expended shell found near the porch of the tavern, a loaded shell that was in the gun when it was found, the two loaded shells found near the tavern on the day after the shooting, a loaded shell taken from the gun in the afternoon of May 4, 1952 by a witness who said he hid the gun after he had seen defendant with it (he said

he hid it because defendant was not "at himself" but then told Henson where it was), a test shell and pellets from it fired by a ballistic expert, and enlarged photographs of the shells to show marks made by the firing pin, breech and ejector. Defendant's contention is that these exhibits were not connected with the crime nor with defendant, citing State v. Maddox, 339 Mo. 840, 98 S. W.2d 535; State v. Darling, 202 Mo. 150, 100 S.W. 631; State v. Swain, 68 Mo. 605. These cases did not involve exhibits and are not in point. Defendant's contention is without merit. See State v. Richetti, 342 Mo. 1015, 119 S.W.2d 330. Henson identified the gun at the trial and said he had left it at the pump house. Defendant admitted having had possession of Henson's gun and Barks said defendant used a gun of that type in shooting deceased. A ballistic expert from the State Highway Patrol showed the gun made the same marks as were on the expended shell found near the tavern porch the night of the shooting. Defendant himself, when the gun was brought to him at the jail the day it was found, said: "That is the gun I set down agin the building." The officers explained when and where they found the shells on the tavern grounds. All of the shells were of the same kind and make as the one the Sheriff took from defendant's pocket. This assignment is overruled.

Defendant also alleges as error the Court's reprimand of defendant while he was testifying in his own behalf. Defendant was being cross-examined as to what occurred when the gun was brought to him at the jail, on the day it was found. The officers had testified that the gun had a loaded shell in it, when they found it, which had slipped over the extractor into such a position that the gun could not be closed. They took the shell out before showing it to defendant, and when it was handed to defendant "he immediately broke the gun and said, 'It has been unloaded.'" Defendant had testified on direct examination that when he took the gun he saw two of the three officers "put their heads over close together" and heard them say "he is going to look and see if that shell is in

there"; and that he then broke the gun and said: "No, that shell aint in there." (The officers denied that they were close together or said anything to each other about this.) When defendant was being cross-examined about making this remark, the following occurred:

"The Witness: (Addressing the jury) Do you men understand how I told it?

"The Court: Just a minute. You talk to the lawyer and not to the jury.

"The Witness: They asked me if I had seen this gun, if that is the gun."

No objection was made and it is apparent that the Court was admonishing defendant not to ask the jury questions.

After further questions on this subject, the following occurred:

"Mr. Williams: You didn't talk very loud and I didn't understand you.

"The Witness: If you want it louder, I can tell it. They was sitting over there like this and I was sitting right here. Them two sat up pretty close together. They said, 'He is going to look for a shell.'

"The Court: I cannot hear what you say. We are interested in only what was said. We are not interested in how they said. You must talk loud enough. You have something at stake in this law suit and it isn't helping you any for me to have to call you down. I warned you once before. I warn you again, you must talk loud enough we can hear you. Do you understand me? If I can't hear you, how can those men back in the jury hear you? How can the court reporter over there hear you? You concentrate on telling the truth plainly and loud enough, and leave out all the histrionics. You are not in any show here. You answer the question and talk loud enough we can hear you, if you please.

"The Witness: All right."

Again there was no objection: and from what appears, it seems that defendant may have been demonstrating the position and actions of the officers, apparently speaking in a low tone as he claimed they were. The cross-examination on this subject proceeded as follows:

"Q. They weren't talking to you, is that it? A. They were talking to themselves and this man here was talking to me.

"Q. Then what did you say? A. That is what I said. I broke the gun and I said, 'No, it ain't got no shell in it.' Is that plain enough?" Do you mean (men?) understand that? (Addressing the jury.)

"The Court: Mr. Brotherton, I am the Judge here. This is the jury and these are the lawyers. If you should have me warn you anymore, you are not helping your case any by showing off. Am I making it plain to you?

"Mr. Smith: If the Court, please, I would like for the record to show I am objecting to the remarks of the Court, twice repeated, that the defendant is not helping himself by the testimony here or his action on the stand.

"The Court: The objection is overruled. I should be commended instead of criticized in trying to help him out. Go ahead."

The Court's statement that he was trying to help him out at least indicated to the jury the Court was not intending to take an unfavorable attitude toward defendant's defense or to indicate any view as to defendant's guilt; and there was no request for any other action. The Court did not say "defendant is not helping himself by the testimony", as stated in the objection, but was referring only to his actions. It was not proper for defendant to ask the jury questions as he did on at least two occasions. Of course, we cannot tell from the record just what defendant's actions were, but it was proper for the Court to reasonably regulate the conduct of any witness so that the trial could proceed in an orderly manner. While the Court might have chosen more appropriate language for this purpose, when considered in connection with the manner in which the matter arose, and the whole record of defendant's testimony, we cannot find that there was any preju-

dicial effect from what the Court said. As we said in State v. Barnes, 325 Mo. 545, 29 S.W.2d 156, 158: "Control of the conduct and demeanor of the witnesses must necessarily be left largely to the discretion of the trial judge. An appellate court, reviewing the trial proceedings from the printed record, should not substitute its judgment for that of the trial judge in such matters, in the absence of knowledge of all the facts and circumstances, and without any attempt being made to show an abuse of the trial court's discretion." See also 53 Am.Jur. 79, Sec. 81; 23 C.J.S., Criminal Law, § 990, page 343; Annotation 65 A.L.R. 1270; State v. Jackson, 283 Mo. 18, 222 S. W. 746. This is not a case like State v. Jones, Mo.Sup., 197 S.W. 156, 158, where the judge himself cross-examined the defendant, not tactfully "but in a way to indicate there was no innocent reason why defendant should employ Dr. Bowline", his codefendant, and then aggravated the mischief by giving his approval of an improper argument by the prosecution. This Court said therein that "From what occurred on the examination of the defendant, and the remark of the court at this juncture of the argument, the jury probably were impressed with the idea that they must convict the defendant at all events." The rule is stated in the Annotation, 65 A.L.R. 1271, "that comments by the judge during the examination or cross-examination of the defendant in a criminal trial do not constitute a ground for new trial or reversal unless it appears that the comments are of such a prejudicial nature as would tend reasonably to influence the minds of the jury against the defendant, consequently denying him the right to a fair and impartial trial." From the whole record, it does not appear that the Court's attitude was unfavorable to defendant and we think it shows defendant had a fair and impartial trial. This assignment is overruled.

Defendant alleges error in instruction No. 1 on the ground that it submitted manslaughter without any evidence to support such an issue, citing State v. Punshon, 124 Mo. 448, 27 S.W. 1111; State v. Bart-

ley, 337 Mo. 229, 84 S.W.2d 637. In the first place defendant's motion for a new trial does not mention submitting manslaughter. Furthermore, this is not a matter of which defendant may complain under Sections 545.030, and 556.220 RSMo 1949, V.A.M.S. See State v. Murphy, 341 Mo. 1229, 111 S.W.2d 132 where the cases and statutes are reviewed. See also State v. Huett, 340 Mo. 934, 104 S.W.2d 252; State v. Reagan, Mo.Sup., 108 S.W.2d 391; State v. Crouch, Mo.Sup., 124 S.W.2d 1185; State v. Gardner, 356 Mo. 1015, 204 S.W.2d 716. This assignment is overruled.

Defendant's final allegation of error is refusal to grant a new trial on the ground of newly discovered evidence. It was claimed that a witness had been discovered who would testify "that Mrs. Mary Bach, widow of deceased, and a witness for the State herein, approximately three or four weeks prior to the alleged offense, stated (to the witness) that she would pay him One Hundred Dollars to shoot her husband, the deceased." Defendant cites State v. Curtis, 77 Mo. 267; State v. Murray, 91 Mo. 95, 3 S.W. 397; State v. Speritus, 191 Mo. 24, 90 S.W. 459; State v. Hutchinson, Mo.App., 289 S.W. 969. In the Curtis case, a rape case, the newly discovered evidence was a statement by the prosecuting witness to the effect that the alleged crime was not committed. In the Murray case, a murder case in which the evidence was altogether circumstantial, the new evidence showed that the witness, whose testimony established the defendant's ownership of a knife found at the scene of the crime, had made very different statements outside the courtroom. In the Speritus case, a case of stealing a wagon, a witness, who testified that defendant had told him he had stolen it, made statements to others that defendant had nothing to do with it but that he, the witness, had found it in a ditch; and there was also new evidence to show that the witness had attempted to sell the wagon. In the Hutchinson case, the new evidence was that one of the jurors in the case had shown prejudice against defendant. In all of these cases the Court felt that the new evidence would probably produce a different result.

The requirements for granting a new trial on this ground are thus stated, 191 Mo. loc. cit. 41, 90 S.W. loc. cit. 464, in the Speritus case: "It devolved upon the defendant to show: First, that the evidence first came to his knowledge since the trial; second, that it was not owing to want of due diligence that it did not come sooner; third, that it was so material that it would probably produce a different result if the new trial were granted; fourth, that it was not merely cumulative; fifth, that the object of the testimony was not merely to impeach the character or credit of a witness; sixth, the affidavit of the witness himself should be produced, or its absence accounted for." See also State v. Smith, Mo.Sup., 247 S.W. 154; State v. Hewitt, Mo.Sup., 259 S.W. 773; State v. Jones, Mo.Sup., 221 S.W.2d 137; State v. Stroud, 362 Mo. 124, 240 S.W.2d 111.

No affidavit of the new witness was filed herein, but only the affidavit of defendant's attorney stating what the witness had told him; and this affidavit stated "that, if permitted to do so, defendant can procure such affidavit (of the witness) or the testimony of such witness at a later date." The verdict in this case was returned on July 22, 1952; the motion for new trial and the attorney's affidavit was filed August 2, 1952; and the motion for new trial was not passed on until September 1, 1952. There is no explanation of the failure to get the affidavit of the witness prior to that time. Moreover, the attorney's affidavit states that when Mrs. Bach made the statement to the witness "he did not take such conversation seriously at the time." There is nothing before us to show the nature of the conversation during which it was made or the circumstances under which it was made or to show whether or not there was any intention for it to be taken seriously. Its main effect would be impeachment and at least it does not directly contradict the testimony of the principal witnesses as to what defendant did at the time, as was true of the new evidence in the cases defendant cites. The State made a very substantial case (both of direct and circumstantial evidence) against defendant herein without Mrs. Bach's testimony, which was mainly cumulative. Under these circumstances, the granting of a new trial on this ground was largely within the discretion of the trial court. State v. Jones, supra; State v. Brown, Mo.Sup., 245 S.W.2d 866. This assignment is overruled.

The judgment is affirmed.

All concur.