## THE STATE v. HOLLINGSWORTH, Appellant.

### Division Two, May 8, 1900.

1. **Instructions:** "ADMISSIONS TAKEN AS TRUE." An instruction that told the jury that any statements of the defendant which have been proved by the State and not denied by the defendant, are to be "taken as admitted as true," was reversible error.

2. ———: RESISTING FORCE WITH FORCE. An instruction was in these words: "If you believe from the evidence that the defendant was on his own premises and that deceased came thereon threatening to kill him or do him great bodily harm or to eject him therefrom, the defendant had the right to repel force with force and to use such means and such force as was reasonably necessary to save himself from harm." *Held*, that this instruction was good as far as it went, but that it fell short of stating the full right of defendant, in that it permitted the jury to say what resistance in their opinion was reasonably necessary, whereas they should consider how it appeared to him at the time under the then circumstances.

3. ———: APPREHENSION: SELF-DEFENSE. An instruction in regard to apprehension of danger, where defendant is on his own premises, is assailed by a man nearly twice as large as himself, and is hemmed up in a stable from which his adversary bars the only exit, should not maximize every restriction of the right of self-defense, and minimize every right of the defendant.

4. ———: MANSLAUGHTER IN THIRD DEGREE: SELF-DEFENSE. Where the evidence, upon which an instruction for manslaughter in the third degree is based, clearly makes out a case of self-defense, no such instruction should be given.

5. ———: THREATS BY DECEASED. The fact that threats made by deceased concerning defendant were in a sense conditional, did not render them inadmissible.

State v. Hollingsworth.

Appeal from Jackson County Criminal Court.—*Hon. John W. Wofford*, Judge.

REVERSED AND REMANDED.

*Marcy K. Brown* for appellant.

(1) Instruction numbered ten given for the State, constitutes reversible error. It is the exact counterpart of an instruction recently condemned by this court upon which, alone, reversal was ordered. State v. Hudspeth, 150 Mo. 28. (2) Instruction numbered nine was clearly erroneous. "It imposed upon defendant the duty of determining, with absolute certainty, what force was necessary to be used in resisting the assault." State v. Harper, 149 Mo. 527; State v. Rose, 142 Mo. 428; State v. Mathews, 148 Mo. 193; State v. Hudspeth, 150 Mo. 32; State v. Evans, 124 Mo. 410; State v. Adler, 146 Mo. 25. (3) Instruction numbered eleven which declares that "the burden of proof is upon the State" is erroneous, misleading and contradictory to other instructions. It is in the exact form as given in civil cases, and by it the jury were allowed to convict defendant, if, in their opinion, the proof merely preponderated in favor of the State. Mackin v. Peoples Ry. Co., 45 Mo. App. 87; Fletcher v. Milborn Mfg. Co., 35 Mo. App. 329; Clark v. Kitchen, 52 Mo. 316. (4) Instruction numbered four, for manslaughter in third degree, should not have been given. The evidence showed no involuntary killing, no opprobrious epithets used, no blow struck— nothing to cause heat of passion, as technically recognized by the law necessary for manslaughter in the third degree, and as an actual fact, no heat of passion was engendered, and none existed. State v. Bulling, 105 Mo. 220; State v. Kotovsky, 74 Mo. 250; State v. Jones, 79 Mo. 441. If an instruction on manslaughter in the third degree is proper in this case, then it must be given in every case where self-defense is relied upon, a doctrine, not for a moment to be upheld. State v.

Alexander, 66 Mo. 148; State v. Watson, 95 Mo. 415; State v. Edwards, 70 Mo. 480; State v. Dierbergèr, 96 Mo. 676; State v. Curtis, 70 Mo. 600; State v. Punshon, 124 Mo. 458.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) The instructions given in this case are such as have often received the sanction of this court. They properly declare all the law in the case, and declare it correctly. All of the instructions offered by the defendant are very similar to those given; so near are they alike that there is no error in the action of the trial court in refusing them. When the court has given an instruction upon a question of law, another instruction declaring the same law, though couched in different words, is entirely out of place and should be refused. (2) It is not in the records that the trial court refused to instruct for manslaughter in the fourth degree. That question is first raised in the motion for a new trial, and can not now be used to secure a reversal of the case. The evidence or records do not show that such an instruction would have been proper. Sec. 3476, R. S. 1889; State v. Edwards, 70 Mo. 480; State v. Ellis, 74 Mo. 207; State v. McKenzie, 102 Mo. 620.

GANTT, P. J.—On the 17th of June, 1898, Elwood Hollingsworth, the defendant, was engaged in the dairy business near Kansas City. He rented the premises in which the homicide hereinafter mentioned took place, from Alex. Schwab. Defendant owned the stable building, having bought it from one George Etom. His lease secured to him the privilege of removing the building at the termination of his lease. It began March 1, 1897, and ran for one year at eight dollars per month, payable at the end of each month. At the expiration of the year this arrangement by mutual agreement continued and defendant had paid for March, April and May,

1898, and neither party had taken any steps to terminate the tenancy. Immediately west of defendant's stables, Schwab, the deceased, had erected stables for his cows, being a dairyman also. While these two stables joined each other, they were separate and distinct. The defendant owned his stable, and occupied it with his cows and feed. He had no rights in Schwab's stables, and Schwab had none in his. They had separate doors and openings, with a car track elevated above the floor between them. The doors of both stables for the cattle opened on the north side of the stables. About two months after leasing to defendant, Schwab made a further lease to Etom, and desired defendant to permit Etom to occupy defendant's stables with his cows. To this defendant would not agree, but said to Schwab that if he would refund him the two months' rent he had paid him, he would move out; that defendant and Etom could not get along in the space in defendant's stables. Schwab refused to refund and Etom found other quarters.

The evidence tended very clearly to show that this incensed Schwab toward defendant as by the arrangement with Etom, Schwab would have had his own stable rent free. To another dairyman, G. T. McGuire, Schwab declared his intention of putting defendant off the premises, and "would fix him so that they would have to carry him out." McGuire warned defendant of this threat, and Schwab's animosity toward him. A short time before the homicide, Schwab also said to Hampton, the street commissioner of Rosedale, that he intended to make defendant leave the place, and if he resisted "he would throw him against the fence and break every bone in his body." On several occasions, when under the influence of liquor, Schwab charged defendant with having "beat him out of the Etom rent by being a d——d crank;" that he "would get even with him for it yet."

On the day before the shooting, as defendant was driving home after delivering his milk, he came upon Schwab and

another man in the public road. Schwab was quarreling with the man and it culminated in Schwab jerking the man out of his wagon and giving him a beating. Defendant shouted at Schwab not to kill the man, whereat Schwab stopped long enough to turn to defendant and say, "I'll give you some of the same medicine later on." Schwab was about thirty years old, weighed about 225 pounds, and was about six feet high. His reputation was that of a violent, high-tempered man. The defendant Hollingsworth was about twenty-eight years old, and weighed 138 pounds. The evidence tended to show that he was a peaceable man and of good reputation.

About two o'clock in the morning of June 17, 1898, the defendant went to his barn to feed and milk his cows, and Schwab's hired man, one John Kurmann, went to Schwab's barn to milk Schwab's cows. This was according to the usual custom of both. As already stated, the cow entrances to both stables were on the north of the respective stables, and each had its separate entrance. Kurmann arrived at the stables in advance of defendant. When the defendant reached his stable, he found that Kurmann instead of admitting Schwab's cows into his stable by the north door was bringing them in through defendant's feed room, and thence into Schwab's stables. He complained to Kurmann and objected to his admitting the cows through that way. Whereupon Kurmann replied that "it was none of his [defendant's] d——d business, and if he didn't keep his mouth shut he would throw him out of there."

Defendant said nothing further just then, but went on letting in his own cows to their stalls, preparatory to milking. Several of the cows remaining in the lot, defendant started out the south way to head them off and drive them in at the north door. On reaching the feed room he found Kurmann had again turned one of Schwab's cows into the feed room of defendant, and the cow was eating and tramping on defendant's feed, and Kurmann was standing as if waiting to see what de-

fendant would do. Up to this point, there is little discrepancy, but Kurmann and defendant differ radically as to what occurred then.

Kurmann testified that defendant said "You s——n of a bi——h, I will put a hole through you," and thereupon he left to bring Schwab down to settle the difficulty. The defendant on the other hand, says he said to Kurmann, "I have told you once to keep the cows out of my feed; they have already done enough damage."

It seems Kurmann shared the dislike of defendant which his master entertained, and angered at the reproof of defendant he made a rush at him and struck at him twice, but defendant warded off and got away from him. Kurmann followed him, however, saying, "You d——d Americans can run over the Spanish, but you can't run over us," alluding to the fact that he and Schwab were Sweitzer Germans. He turned suddenly and left, going toward the house, angrily threatening defendant that he was going to get Schwab and they would throw him out of there and "cut his d——d throat."

Defendant testified that knowing the ill will of Schwab and his temper and great strength, he became alarmed. He knew he was no match for the two, and feared that they would return and beat if not kill him. The dairies were isolated, on an untravelled country road on the Kansas line. No neighbors lived near, except two shanties occupied by German Sweitzers, who naturally would side with his antagonists. He lived alone in a one room shanty near the stables. He had a pistol in his house, and he concluded to go there, but after reaching the house he says he concluded they might follow him, and if they did he would be penned up, so he came out. After a while, hearing nothing, he thought perhaps Schwab would not come down. He determined to put the pistol in his pocket, thinking he could keep them off if they assaulted him. Hearing a noise among his cows, he hurried

back to his stables, fearing that a vicious cow he had was hooking the others. After tying up the remaining cows, he started to his feed box to get the feed. Just as he was stepping into his feed room Kurmann suddenly sprang up, saying to Schwab, "There he goes, throw him out, kill him, the s— o— b—."

Schwab rushed in saying, "You called me a s— o— b—. You raise hell about my cows." Defendant remonstrated with him, denied he had called him such a name, and told him he had no desire to have a fuss with him about anything, and would have had no words with Kurmann if he acted half way right.

Kurmann urged Schwab on, and the latter seized a shovel that was used in mixing feed, and started at defendant, saying "You beat me out of the Etom rent, and I am going to fix you, I'll smash your head." The defendant retreated to the back of the feed room from which there was no exit, save by Schwab. Then defendant got up on a step by the feed box, and seeing he could not pacify Schwab pulled his revolver and warned him to stop. He told him he had no right on his premises, and to get out. Schwab, however, continued to advance with the shovel in his hands, and with it raised to strike when defendant fired and killed him.

The course of the bullet corroborates defendant's evidence, that he was standing on the step, above Schwab, when he shot him. The bullet entered the left side at a point where the neck joins the collar bone, ranging from left to right downward, and backward, until it struck the spinal column, passing between one and two of the vertebrae, and severed the spinal cord. Defendant fired only one shot, and as Schwab fell, he ran past him out into the barn.

Kurmann denies that he was with Schwab at the time the assault was made. He says he had gone into Schwab's stables, and was sitting with his back to the partition which separated the Schwab stable from the feed room. His evidence before

the coroner and at the preliminary trial, conflicted in several points with that given by him before the jury. However, at no time does he pretend that he saw defendant when the shot was fired. He does, however, place him in the feed room. He was also impeached by the testimony of Miller, who distributed newspapers in that neighborhood, to whom he detailed the circumstances of the killing. Evidence was also introduced tending to impeach his character for truth and veracity.

The defendant was indicted at the September term, 1898, and was tried at the January term, 1899, and convicted of manslaughter in the third degree, and sentenced to three years in the penitentiary, from which he appeals. Motions for new trial and in arrest of judgment were duly filed and overruled, and exceptions saved.

It is deemed unnecessary to incorporate the instructions asked, given and refused. Such only as affect the merits of this appeal will be noticed.

I. Among other instructions given on behalf of the State, the one numbered 10, is as follows:

"The court instructs the jury that if you find and believe that any statements of the defendant have been proven by the State and not denied by the defendant, then they are taken as admitted as true."

In short, this was equivalent to charging that if any witness testified to statements made by defendant, and he did not take the stand and deny them, the jury would assume they were true. It required the defendant to take the stand and testify upon every statement attributed to him. No such obligation rested upon him. He had a perfect right to sit still and decline to testify at all, and the burden was on the State to prove his guilt beyond a reasonable doubt. The court by this instruction invaded the province of the jury and decided for them the weight of the evidence of the State's witnesses. For this identical error the judgment in State v. Hudspeth, 150

Mo. 12, was reversed.    Without going over the ground again, this instruction must be held reversible error.

II.    The ninth instruction given by the court of its own motion is challenged by defendant.

It is in these words:    "If you believe from the evidence that the defendant was on his own side of the premises, and that Schwab came on defendant's side threatening to kill or do him great bodily harm, or to eject him from the same, the defendant had the right to repel force with force, and to use such means and such force as was reasonably necessary to save himself from harm."

Unquestionably this was correct so far as it went but it is urged that it fell short of defining the full right of defendant, in this, that defendant was entitled to have the jury consider not merely what they would think would have been reasonable force to resist the assault of Schwab in the light of all the evidence developed in the case, but it was defendant's right to have them apply the law to the facts as they appeared to defendant at the time he shot under the then surrounding circumstances.

In resisting the commission of a felony upon his person, the person so resisting is not required to ascertain with mathematical certainty just how much force is necessary to repel the assault.    While the law exacts that he shall not use unnecessary force, it permits him to use such force as appears to him necessary under all the surrounding circumstances, and if he acts in a moment of apparently impending peril, he is not bound to gauge the amount of his resistance to a nicety and the jury should consider how it appeared to him at the time, and not how it appears to them when considering their verdict.

While the instruction evidently intended to give the defendant the benefit of this principle, we think it fell short of stating the full right of defendant.    [State v. Palmer, 88

Mo. 568; State v. Harper, 149 Mo. 514; State v. Rose, 142 Mo. 428.]

III.   The thirteenth instruction given by the court is also assigned as error in this, that it maximizes every restriction of the right of self-defense, and minimizes every right of the defendant.   The instruction in these words:   "The court instructs the jury that to justify a killing on the ground of self-defense, it must appear that the party killing was apprehensive in consequence of the acts and conduct of the party killed, that some great bodily injury to himself was impending and about to fall on him, and that such killing was necessary to prevent such injury, either apparent or actual; therefore, if you believe from the evidence that in consequence of the acts and conduct of Schwab, either alone or acting with another at the time the fatal shot was fired, the defendant had reasonable cause to believe and did believe that Schwab was about to kill him or do him some great bodily harm, and that defendant shot to prevent such design being consummated, then your verdict should be for defendant. But you must say from the evidence under all the facts and circumstances before you, whether the defendant did have reasonable cause for such apprehension.   If he did not have reasonable cause for such apprehension even though he believed he had, you can not acquit him on the ground of self-defense."

The defendant prayed an instruction substantially like the above, with this modification:   "It is not, however, necessary that the danger should have been actual or real, or that the danger should have been about to fall upon him.   All that is necessary is that the defendant should have had reasonable cause to believe that state of facts and did so believe, and shot and killed Schwab to prevent the consummation of such design on the part of Schwab."   The court refused this, and defendant duly excepted.

The court erred in refusing this qualification of its instruction on self-defense.   This has been approved by this

court since the case of State v. Starr, 38 Mo. 270.   The judgment in State v. Eaton, 75 Mo. 586, was reversed on this identical ground.   As said then by this court, "We do not mean to say that a mere supposititious or conjectural danger —a danger existing only in the imagination of the accused, will excuse or justify a homicide. There must be an apparent danger affording a reasonable ground for apprehension on the part of the slayer, that unless he kill or disable his adversary, his own life or limbs are in imminent peril. Whether the appearances of danger to the accused were such as to afford such reasonable ground of apprehension, is a question for the jury."

The defendant is entitled to act upon appearances although it may turn out afterwards, that the appearances were false, and there was in fact no design on the part of his adversary to kill or do him great bodily harm or danger that it would be done.   Considering the great disparity in the size of deceased, and defendant and the character of Kurmann's evidence; the fact that defendant was on his own premises, and their isolation, and the evident purpose of deceased and Kurmann to bring about a difficulty with him; and the various threats made; we think this was peculiarly a case in which the defendant should have had the full benefit of the law of self-defense, and that the court's instruction fell short in the particulars enumerated.

IV.   As the judgment must be reversed, we add that instructions numbered seven and eleven should not have been given.

As to number eleven the court had properly required the jury to find defendant guilty beyond a reasonable doubt or acquit him, and this instruction had no proper place in the case.   It is applicable only to civil causes.

As to instruction numbered seven, it was well enough to direct the jury that the indictment was a mere formal charge and of itself was no evidence of defendant's guilt, but the

form in which it was given was unfortunate. In lieu thereof, the instruction asked by defendant should have been given.

V. Among other instructions the court gave the following:

"The court instructs the jury that if you fail to find a verdict according to the law as declared in instruction No. 2 or instruction No. 3 (on murder in the first and second degrees) but shall find from the evidence that the defendant at the county of Jackson and State of Missouri, at any time within three years next before the 13th day of September, 1898, shot and killed Alexander Schwab in the heat of passion without a design to effect death, but not under such circumstances as to justify him on the ground of self-defense, then you should find him guilty of manslaughter in the third degree and so state in your verdict."

The jury found the defendant guilty of manslaughter in the third degree, and the defendant insists the court erred in instructing on manslaughter in the third degree. The defendant testified that he shot the deceased to prevent being "brained," by deceased, with the shovel. Looking carefully through this record, we think we find the basis of this instruction in an answer given by defendant to a question propounded by the court, wherein the defendant said to the court he did not intend to kill deceased. Upon full consideration, however, we think that according to defendant's own evidence he intentionally shot deceased to save his own life. That he intended merely to disable him or cripple him did not make it manslaughter.

This instruction could only have been predicated upon defendant's evidence and taking his testimony it made out a clear case of self-defense, but in no sense one of manslaughter in the third degree. The court therefore erred in giving this instruction which unquestionably brought about the verdict rendered. [State v. Pettit, 119 Mo. 410; State v. Nocton, 121 Mo. 551.]

There are numerous other errors assigned on the instruction and the remarks of the prosecuting counsel, but with the foregoing remarks we have no doubt the court will be able to avoid further error in the instructions, and while many of the statements of counsel seem to be clearly out of the record, they can be obviated on another trial by counsel, by relying upon the evidence in the case, and scrupulously abstaining from volunteering statements not made by the witnesses.

The statements made by the deceased to defendant after the shooting, in which he declined any assistance from defendant, were properly rejected. They would have thrown no light whatever upon the transaction then passed. The court, however, erroneously excluded the evidence of threats made by deceased against defendant. They were material in determining whether deceased was the aggressor. The fact that they were conditional to a certain degree did not render them inadmissible. [State v. Johnson, 76 Mo. 121; State v. Adams, 76 Mo. 357; State v. Bailey, 94 Mo. 311.]

The jury by their verdict acquitted defendant of both murder in the first and second degree, and the evidence seems to fully justify them in so doing.

For the errors noted, the judgment is reversed and the cause remanded to be proceeded with in accordance with the views herein expressed. All concur.