## THE STATE v. SILAS DARLING, Appellant.

**Division Two, March 5, 1907.**

1. **SELF-DEFENSE: Apprehended Danger: Appearances: Instruction.** An instruction which, after telling the jury that it was not necessary that the danger to defendant's associate who killed deceased should have been real and about to fall, also tells them that all that was necessary was that such danger existed, is faulty. Whether the danger really existed or not, if he had good reason to believe it existed, he had the right to act upon appearances, although it might thereafter turn out that the appearances were false. He must have decided at his peril, under the circumstances as they appeared to him, but whether he had good reason to act as he did is for the consideration of the jury.

2. ——: ——: ——: ——: **Corrected By Other Words.** The instruction said: "In such case it is not necessary that the danger should have been real and about to fall, all that is necessary is that such danger existed; on the other hand, it is not enough that said Ernest Darling believed the existence of such danger, but he must have good cause for so believing." *Held,* that the error in the first clause is not cured by the last clause, because inconsistent therewith. All that was necessary to a complete defense by the said Ernest was that he had good ground to believe, and did believe, that such danger to his life or limb existed, whether it really existed or not.

3. **INSTRUCTIONS: In Plain Language.** Instructions should always be couched in such plain and unequivocal language as to be readily understood and comprehended by the jury.

4. **INTEREST OF WITNESS: Cross-Examination.** Proof of the acts and statements of a witness tending to show his prejudice against the defendant, and his interest in the prosecution, is always admissible; and it is also competent for defendant,

for the purpose of impeaching a witness, who denies upon cross-examination having made certain statements indicating prejudice towards defendant, to show by other witnesses that he had in fact made such statements. And in this case it is held that it was not only proper to permit defendant to ask a State's witness if he had not stated to two of the panel that he ·desired to talk with them about the case and that he wanted to see them "stick" defendant, but it was error not to permit defendant to show by those veniremen that he had made those statements.

5. **SELF-DEFENSE: Provoking or Aiding a Fight: Particeps.** If a person provokes a combat or brings on a difficulty, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, and this without regard to the extremity to which such person may have been reduced in the combat. And if a person, intending an ordinary battery only, seeks out his adversary and provokes a combat or brings on a difficulty with the design to commit a battery only, and death is the result of such battery, he is guilty of manslaughter, without regard to the extremity to which he may have been put. And a defendant who accompanies such person, for the purpose of aiding or encouraging him, is alike guilty. And the instruction set out in the opinion is in substantial compliance with this last proposition, nor did such instruction trench upon the principal's right of self-defense.

6. **INSTRUCTIONS: Refusing Defendant's.** Where the instructions given for the State cover every phase of the case, it is not error to refuse all instructions asked by defendant.

7. **EVIDENCE: Connection Not Shown.** The State should not be permitted to show that the farmer for whom deceased was working, before defendants went to the place where deceased was plowing and assaulted him, on his way to town passed within a quarter of a mile of defendants' home and in plain view thereof, unless it is also shown that some of them saw or were in a position to see him.

Appeal from Cooper Circuit Court.—*Hon. Wm. H. Martin*, Judge.

REVERSED AND REMANDED.

*W. V. Draffen* and *C. D. Corum* for appellant.

(1) The court erred in failing to correctly announce the law of self-defense. (a) Defendant, under

no view that can be taken, was guilty of any crime, if his brother, Ernest Darling, acted in self-defense. It was, therefore, incumbent upon the court to correctly instruct the jury upon this inestimable right. Instruction 9 is the only one pertaining to the law of self-defense that was given in the case. That it is erroneous, confusing, and deprives defendant of his rights under the law, is plain. State v. Starr, 38 Mo. 270; State v. Slone, 47 Mo. 612; State v. Eaton, 75 Mo. 591; State v. Johnson, 76 Mo. 126; State v. Harrod, 102 Mo. 612; State v. Smith, 125 Mo. 8; Nichols v. Winfrey, 79 Mo. 547; State v. Hollingsworth, 156 Mo. 187. (b) It is no answer to this contention of defendant's to say that in one part of the instruction the jurors were told that it was not necessary for the danger to be real. The court did say that. But before the jury had time to grasp and digest the utterance, the court retracted and told them it was necessary for defendant to show that danger actually existed. (2) The court erred in refusing to permit defendant to attack the credibility of William Spry. State v. Privitt, 144 Mo. 94; State v. Jones, 106 Mo. 311; State v. Elkins, 101 Mo. 352; People v. Anderson, 105 Cal. 32; 1 Greenleaf on Ev. (15 Ed.), sec. 450; 1 Wigmore on Ev., sec. 950; 30 Am. and Eng. Ency. Law, 1088, 1089. The hostility of the witness may be shown by independent testimony without even first examining the witness himself as to his hostility. People v. Moore, 15 Wend. 419; People v. Thompson, 41 N. Y. 6; People v. Brooks, 30 N. E. 189. The bias of a witness is not a material matter. Hollingsworth v. State, 14 S. W. 41; 1 Greenleaf on Ev., sec. 450; Crumpton v. State, 12 Ark. 972; Wharton on Criminal Ev., sec. 485. Nor is it collateral. Bennet v. State, 13 S. W. 105; Gillett on Indirect & Collateral Ev., 139; 30 Am. and Eng. Ency. Law, 1102; Underhill on Criminal Ev., 305. The same rule applies in civil cases. Hartpence v. Rodgers, 143 Mo. 623; Gale v.

Railroad, 76 N. Y. 594; Schultz v. Railroad, 89 N. Y. 242; Garnsey v. Rhodes, 138 N. Y. 461; Hedge v. Platt, 22 Conn. 262; Cask v. Brown, 34 N. H. 460; Starr v. Cragen, 24 Hun 177; Beck v. Hood, 39 Al. 842.   (3) Instruction 8 absolutely deprived defendant of the right of self-defense. It was not necessary under this instruction for the jury to find that Ernest Darling commenced the difficulty by assaulting Jeffress or that he provoked the difficulty by opprobrious language addressed to him, or that he brought on the difficulty in any way.    The language of the instruction is that if "during such difficulty;" it does not say "if during a difficulty caused and brought about by any wrongful act of Ernest Darling." The difficulty may have been caused and brought on by deceased, and still defendants would have been guilty of manslaughter. Under the instruction given, the jury must have found defendant guilty.    And this notwithstanding they might have believed the evidence which was offered on behalf of defendant, to the effect that Ernest Darling was inoffensive and unoffending when he was assaulted by the deceased with a deadly weapon. State v. Gordon, 191 Mo. 121. No person can be guilty of manslaughter simply because he has formed an intention in his mind to whip another person.    A man cannot be convicted of crime because he has an unlawful intent. He must have done some act to effectuate the intention. In the class of cases which we are considering, he must have provoked the combat or brought on the difficulty for the purpose of effectuating his intention to whip his adversary. The instruction at bar finds no support in reason or authority. State v. Evans, 124 Mo. 410; State v. Gordon, 191 Mo. 114; State v. Partlow, 90 Mo. 609; State v. Gilmore, 95 Mo. 554; State v. Patterson, 159 Mo. 560; State v. Garrett, 170 Mo. 395; Saunders v. State, 97 S. W. 1046. (4)   The court permitted the State to prove by Charles

Carroll that on his way to Blackwater on the afternoon of the tragedy he passed within a quarter of a mile of the Darling home and in plain view thereof. There was no evidence offered that defendant, or his co-defendants, either saw or were in a position to see Mr. Carroll as he passed, nor does the evidence show that Carroll saw defendant, or either of the defendants, on his way to Blackwater. The admission of this testimony was error. State v. Darling, 199 Mo. 168.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1) Much stress is laid by appellant on the action of the court in giving the instruction on the subject of self-defense; but said instruction, when carefully examined, is not subject to said criticism. In reading said instruction and in considering the whole of it, it will be seen that it fully stated the law of self-defense to the jury, and an intelligent jury could not have been misled by reason thereof. State v. Smith, 125 Mo. 8. It is not necessary for the court to use the same formula every time; and even though the instruction is awkwardly worded, yet if it fairly states the law to the jury on the subject of self-defense, the instruction is sufficient. In a case where the court instructed the jury that they must be satisfied of defendant's guilt by the evidence in the case, or by the lack of evidence, this court held that the instruction, when considered as a whole, did not misdirect the jury, and the judgment was affirmed. State v. Kelley, 191 Mo. 680. (2) Spry, when questioned by defendant's attorney, replied that he had not made statements to certain men on the panel of forty to the effect that the defendant was guilty, should be punished, etc. Thereupon, defendant offered to prove by certain members of the panel of forty that Mr. Spry did make such statements to them prior

to the selection of the twelve men to try this case. It will not require much argument to convince this court that the trial court ruled properly when it excluded said proffered evidence. The rule which all our courts have adopted is that the examination of a witness and the contradiction of a witness on such matters rests in the discretion of the trial court. 2 Wigmore on Ev., sec. 950; 1 Elliott on Evid., sec. 161; 1 Greenleaf on Evid., sec. 450; People v. Brooks, 131 N. Y. 326; Consaul v. Sheldon, 35 Neb. 254. And our authorities hold that the test of the admissibility of evidence in contradiction of the cross-examination of a witness is whether defendant would have the right, as an original proposition, to have introduced such contradictory evidence. Wharton's Crim. Evid., sec. 485.

BURGESS, J.—At the October term, 1905, of the circuit court of Cooper county, upon an information filed by the prosecuting attorney of said county on the 16th day of May, 1905, charging the defendant and one Ernest Darling and one Dorvil Burris, with murder in the first degree for the killing of one Samuel Jeffress, at said county, on the 13th day of March, 1905, the defendant was convicted of manslaughter in the fourth degree and his punishment assessed at two years in the penitentiary. After filing unsuccessful motions for new trial and in arrest of judgment, defendant appealed.

Prior to the trial of this defendant, his co-indictee, Dorvil Burris, had entered a plea of guilty to manslaughter in the fourth degree, had been sentenced to two years in the penitentiary, and been paroled.

The State's evidence tended to show that the defendant and Ernest Darling were brothers, and lived with their parents on a farm in Cooper county, seven miles from Blackwater, and that Dorvil Burris lived with the Darlings and worked on the farm. Sam Jef-

fress, the deceased, prior to Saturday, March 11, 1905, lived with his mother in the village of Nelson, Saline county, and a few miles from Blackwater. On said Saturday the deceased went to work as a farm hand for one Charles Carroll, whose farm was situated about two miles from the Darling homestead. On Sunday afternoon Emmett Yeager visited at the Darling home, and told defendant and his brother that the deceased had gone to work for Charles Carroll. An unfriendly feeling had been existing between the deceased and both of the Darling boys, and as soon as Yeager had imparted this information to the brothers, Ernest Darling said he was going over to Carroll's next morning to ''get'' the deceased. Afterwards, in another room of the house, Ernest Darling repeated his threat in the presence of the defendant, and later, the same evening, the defendant said to witness Burris, ''Yes, I believe I will go down with Ern tomorrow; Sam might make a knife play.'' On Monday the three young men worked about the Darling farm until noon, when the arrangements were made to go over to the Carroll farm. The defendant and his two companions went over to the barn of the Darling place and had a talk on the advisability of going after the deceased at that time, and Burris insisted that it would be best to wait and some day get deceased on the road. Ernest Darling answered, ''No, if I don't get him now I never will get him.'' Defendant said, ''No, Dorvil, I believe he ought to get him now.'' After the conversation at the barn, defendant and his brother went around on the side of the house where there was a pile of old iron. On the way to Carroll's the defendant said to his brother, ''You will have to watch him if he is working with a hoe or scythe, or something to cut you with.'' In the same conversation Ernest said to defendant, ''It will be a hell of a joke if he has gone to town and would not be there.'' When they neared the Carroll home, it was

agreed, at the defendant's suggestion, that he should do the talking, defendant saying, "I will see Mr. Carroll and tell him I want to borrow a lister." Defendant accordingly went up to the house and asked if Mr. Carroll was there, and Mrs. Carroll replied that he had gone to town. Defendant then said that they would go down the river and meet him on his return. The three then walked down to the corn pens, when defendant told Burris to go back and find out where the deceased was working. Burris went back and ascertained from Mrs. Carroll that deceased was working in a certain field. This field lay in a direction contrary to that from which Mr. Carroll would come in returning from Blackwater. The three young men crossed a wheat field, climbed over a wire fence, entered the field where the deceased was plowing and walked towards him. The deceased stopped plowing as they approached, leaned against the handles of the cultivator, with his arms folded and the lines around his neck. Defendant and Burris engaged the deceased in conversation, while Ernest Darling gradually and stealthily slipped around to the side or back of deceased and hit him on the back of the head with what appeared to witness Burris to be a piece of iron. The blow felled deceased to the ground, and Ernest Darling struck deceased several times with the bar of iron after he fell. While striking the deceased, Ernest Darling said, "I reckon I will get even with you; you remember how you done me at Blackwater." After assaulting the deceased Ernest Darling put the piece of iron in his pocket, and shortly afterwards stated to Burris that he had put it in a safe place where nobody could find it. The deceased tried to ward off the blows with his hands, which had leather gloves on, and these gloves were offered in evidence and identified, there being blood on them. The defendant, after the assault was committed by his brother, said, "I know what we will do, turn the team

loose and make them think the team done it." About that time William Spry was passing through the field, and one of the three young men called to him. When Spry arrived upon the scene of the trouble and saw the condition of deceased he asked what was the matter, and defendant said, "They have had a little scrap here, Sam and Ern." Witness Spry found deceased in a sitting posture, with blood all over his face and in his hair, the lines still around his body, and his leather gloves lying on the ground in front of him, one on top of and across the other. Ernest Darling, who was standing some feet away from Spry, said, "He has been bullying around Blackwater long enough; G-d d-n him, let him bleed." He also said to Spry, in the presence of defendant, that deceased had called him a vile name, that he couldn't stand it, and that he hit deceased and "knocked him plumb over the cultivator handles, with the lines around his shoulders."

Defendant suggested that they take hold of the deceased and walk him to the house, but Spry discovered that deceased was not strong enough to walk. It was then suggested by defendant that they unhitch one of the mules and let deceased ride to the house, but Spry was of the opinion that deceased was not strong enough to do that. Then, at Mr. Spry's suggestion, defendant unhitched the mules from the cultivator, drove them to the Carroll house, and procured a wagon in which deceased was placed and taken to the house, the defendant, however, declining to assist in lifting deceased and placing him in the wagon for fear that he might get blood on his hands. The deceased died about the time they arrived at the house. A monkey wrench was found in the left hand pants pocket of deceased, and it had been seen there by witness Spry when he first arrived upon the scene and looked at the deceased.

A number of witnesses testified that they visited the scene of the tragedy the day after it occurred, and

saw under the handles of the cultivator two pools of blood and two depressions in the ground which were apparently made by a man's head, and that blood and hair were found in said depressions. The State's evidence also tended to prove that on the day of the difficulty there were no rocks near the cultivator, nor near the pools of blood, but that some days later several rocks were found there.

Dr. E. A. Wilson, who examined the body of the deceased, testified that he found one wound three inches long to the right of the superior bone, one on the right bone of the head, another one just a little below and a little bit forward, about one inch and a quarter long, and a fourth wound still further forward on the head; all of which wounds fractured the skull. A fifth wound was found just over the eye, a sixth below the eye and a seventh across the nose. Dr. Wilson further testified that these wounds produced the death of Sam Jeffress, and that they were made by some kind of a triangular-shaped blunt instrument. The physician further testified that it was possible that said wounds could have been made with a rock, a long, peculiarily shaped rock, provided it had a straight edge, as the wounds produced were clean cut to the bone, and the bone was fractured. He further testified that it would have been possible for said wounds to have been produced by a bar of iron, a triangular-shaped piece of iron. The undertaker testified that he found seven wounds upon the head of the deceased; three in the back of the head, one in the forehead, one just below the edge of the hair, one on the right of the head and one across the nose.

Mr. Carroll testified for the State that on the morning of the day deceased was killed he rode to Blackwater, passing within sight of the Darling house, which was about a quarter of a mile from the road. Witness stated, upon cross-examination, that he saw some men near the Darling house as he passed by, but

that he didn't know who they were, nor could he say the defendant was one of them.

After the young men had been arrested and were in jail witness Burris had a conversation with defendant in which the latter said, "We must all stick together." Defendant also said, "You must not give us away;.I might get out of here some time, and you will know what I will do to you; you know what a devil I am."

The evidence for the defendant tended to show that he never knew of any threats made by his brother against the deceased; had no arrangements whatever with his brother, nor with Burris, to go over and assault the deceased, but that he went down to Mr. Carroll's house on the day of the killing for the purpose of getting a lister, and to aid Burris in getting employment. He admitted that he never got the lister from Mr. Carroll, but continued to plow corn for some days without the same, up until he was arrested. Defendant's evidence further tended to show that after they learned from Mrs. Carroll that her husband was not at home the three started around the road in order to meet Mr. Carroll when he came home; that he did not know that the deceased was down in the field until they got into said field; that defendant and Burris walked around and began talking to the deceased, when the deceased said to Ernest Darling, "What are you doing roving around through the country, you G— d— son of a b—?" At the same time deceased threw the lines off his shoulder and started at Ernest Darling with a monkey wrench, threatening to crack his head. Afterward deceased came toward Ernest two or three steps, Ernest reached down and picked up a rock and struck deceased several times on the head, first on the front part and then on the back of the head. The defendant's evidence further tended to show that deceased struck Ernest Darling several times on the arm with the mon-

key wrench, which angered him and precipitated the fight. His evidence also tended to show that deceased got his head against the breast of Ernest Darling, and was pushing against him at the time the blows were struck with the rock. After striking the deceased several times, deceased said, "Enough," and Ernest Darling never hit him any more. One witness for the defense testified that she found a rock near the scene of the difficulty upon which she saw blood; but the rock was not shown in evidence. No bloody garments were offered in evidence by defendant, and no proof was offered tending to show that his brother's shirt or coat was bloody. Defendant denied that his brother had a piece of iron, and claimed that Ernest Darling struck deceased for the purpose of protecting his life. There was also evidence tending to show that the deceased made divers threats against the life of Ernest Darling prior to this difficulty, none of which threats, however, were communicated to Ernest until after the death of deceased; and also some evidence tending to show that the deceased had the reputation of being a turbulent and quarrelsome boy.

Instruction numbered 9 given by the court is challenged upon the ground that it does not correctly announce the law of self-defense. It is as follows:

"9. If you find from the evidence that Ernest Darling struck Samuel Jeffress with some instrument or weapon, which resulted in the death of said Jeffress, and at the time said Darling struck the deceased he had good reason to believe and did believe, from the conduct or appearance of deceased, that the deceased was about to inflict upon him some great bodily harm, and the said Ernest Darling struck him for the purpose of averting such apprehended danger, then said Ernest Darling killed said Samuel Jeffress in self-defense, within the meaning of these instructions, and if you so

find, then you must find the defendant in this case not guilty. In such case, it is not necessary that the danger should have been real and about to fall, all that is necessary is that such danger existed; on the other hand, it is not enough that said Ernest Darling believed in the existence of such danger, but he must have had good cause for so believing.

"If, however, you find from the evidence, beyond a reasonable doubt, that said Ernest Darling, prior to the killing of Samuel Jeffress, had formed a design to kill said Jeffress, or to do him some great bodily injury, and that the defendant, Silas Darling, had knowledge of such purpose or design on the part of said Ernest Darling, and to carry out such design the said Ernest Darling armed himself with a deadly weapon, and sought the said Jeffress, and provoked, brought on or entered into a difficulty with the said Jeffress, which resulted in his death, then such killing was not done in self-defense, however imminent the peril of said Ernest Darling may have become in consequence of an attack made upon him by the deceased. And if you find that the defendant, Silas Darling, with knowledge of such purpose on the part of his brother, Ernest Darling, and with knowledge that the said Ernest Darling intended to use a deadly weapon upon the said Samuel Jeffress, and at the time, or prior thereto, by his presence, words or acts, encouraged, aided or abetted the said Ernest Darling in carrying out such purpose, or was then and there present for the purpose and with the intent to aid and assist, if necessary, his brother, Ernest Darling, in such difficulty, and if under such circumstances you find that the said Ernest Darling killed the said Jeffress, then such killing was murder in the first degree, and the defendant in this case is just as guilty as if he struck the blow himself."

This was the only instruction given upon that feature of the case, and it is claimed that it is erroneous and confusing, and deprives defendant of his rights

under the law. Especially does defendant object to that part of the instruction which says: ''In such cases it is not necessary that the danger should have been real and about to fall, all that is necessary is that such danger existed; on the other hand, it is not enough that said Ernest Darling believed in the existence of such danger, but he must have had good cause for so believing.''

Under this instruction, it is insisted by defendant, that it was incumbent upon him to show, first, that Ernest Darling must have been in actual and positive danger before he was justified in striking the deceased; second, that he believed in the existence of such danger; third, that he must have had good cause for believing in the existence thereof.

In the case of State v. Sloan, 47 Mo. 604, it was held by this court that when a person apprehends that some person is about to do him great bodily harm, and there is reasonable grounds for believing that there is imminent danger of such design being accomplished, he may safely act upon appearances, and even kill his assailant if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterwards turn out that the appearances were false, and there was, in fact, neither design to do him serious injury nor danger that it would be done. The same rule is announced in State v. Starr, 38 Mo. 270; State v. Eaton, 75 Mo. 586; State v. Smith, 125 Mo. 2; State v. Hollingsworth, 156 Mo. 178. The instruction is faulty, in that, after telling the jury that it was not necessary that the danger to Ernest Darling should have been real and about to fall, it says all that was necessary was that *such danger existed,* when the law is that, whether the danger really existed or not, if he had good reason to believe and did believe it to exist, he had the right to act upon appearances, although it might thereafter have turned out that the appearances were false. He must, of course, have decided at his

peril, under the circumstances as they appeared to him, but whether he had good reason for acting as he did was for the consideration of the jury. [State v. Harrod, 102 Mo. 590.]

In State v. Hollingsworth, supra, the trial court gave an instruction upon self-defense as follows: "The court instructs the jury that to justify a killing on the ground of self-defense, it must appear that the party killing was apprehensive, in consequence of the acts and conduct of the party killed, that some great bodily injury to himself was impending and about to fall on him, and that such killing was necessary to prevent such injury, either apparent or actual; therefore, if you believe from the evidence that in consequence of the acts and conduct of Schwab, either alone or acting with another at the time the fatal shot was fired, the defendant had reasonable cause to believe and did believe that Schwab was about to kill him or do him some great bodily harm, and that defendant shot to prevent such design being consummated, then your verdict should be for defendant. But you must say from the evidence under all the facts and circumstances before you, whether the defendant did have reasonable cause for such apprehension. If he did not have reasonable cause for such apprehension, even though he belived he had, you cannot acquit him on the ground of self-defense." The defendant in that case prayed an instruction substantially like the above, with this modification: "It is not, however, necessary that the danger should have been actual or real, or that the danger should have been about to fall upon him. All that is necessary is that the defendant should have had reasonable cause to believe that state of facts and did so believe, and shot and killed Schwab to prevent the consummation of such design on the part of Schwab." The trial court refused this modification, and this court said: "The court erred in refusing this qualification of its instruction on self-defense. This has

been approved by this court since the case of State v. Starr, 38 Mo. 270. The judgment in State v. Eaton, 75 Mo. 586, was reversed on this identical ground. As said then by this court: 'We do not mean to say that a mere supposititious or conjectural danger—a danger existing only in the imagination of the accused — will excuse or justify a homicide. There must be apparent danger affording a reasonable ground for apprehension on the part of the slayer, that unless he kill or disable his adversary, his own life or limbs are in imminent peril. Whether the appearances of danger to the accused were such as to afford such reasonable ground of apprehension, is a question for the jury.' "

The words, "on the other hand it is not enough that said Ernest Darling believed in the existence of such danger, but he must have good cause for so believing," did not correct the preceding part of the sentence alluded to and quoted, because inconsistent therewith, in that, in the first instance, the jury were told that all that was necessary was that such danger existed, while in the part last quoted they were told that it was not enough that said Ernest Darling believed in the existence of such danger, but he must have had good cause for so believing. All that was necessary to a complete defense by Ernest Darling was that he had good ground to believe, and did believe, that such danger existed, whether it really existed or not.

While it is conceded by the State that the instruction is awkwardly worded, it is insisted that it fully stated the law of self-defense, and that an intelligent jury could not have been misled by reason thereof. Instructions are given upon the theory that all jurymen are, at least, of ordinary intelligence; but instructions should always be couched in such plain and unequivocal language as to be readily understood and comprehended by the jury; and we do not, for the reasons indicated, think that this instruction is of that character.

The next error assigned is with respect to the action of the court in refusing to permit defendant to attack the credibility of one William Spry, who testified as a witness on the part of the State. Spry testified to what he saw and heard immediately after the fatal blow; and upon cross-examination by defendant, the following occurred:

"Q. You are anxious to see them convicted? A. Why, no; no, sir.

"Q. You are not? A. No, sir.

"Q. You know Mr. J. Copass? A. No, sir.

"Q. Do you know Mr. Steve Smith? A. No, sir.

"Q. Were you down in Mr. Walterscheid's saloon on yesterday morning just before coming to this court? A. I don't know whether I was or not; I was in several places.

"Q. Do you remember having seen two gentlemen there on the panel of forty — there were forty jurors from whom this jury was selected — do you remember seeing two of these men that composed that forty down there in the saloon on yesterday morning? A. I don't remember; no, sir, I don't.

"Q. Did you see two men down there? First, this question: Didn't you go to talk to a gentleman about this case, and didn't he tell you that he was one of the forty; that he might be selected on this jury and that you must not talk to him about this case? A. Well, I don't remember whether I did or not.

"Q. And then didn't you insist on talking to him, and didn't you tell him that you knew a lot about it, and you wanted to tell him about it because he might be one of the twelve? A. I don't remember anything about that.

"Q. Did that occur or not? A. No, sir; I don't think it did, no, sir.

"Q. It didn't occur? Now, then, after he went away and declined to talk to you about it, didn't you see another man, named Joe Copass, and didn't you tell

him that you wanted to talk to him about the case, and he also told you that he could not talk to you about it and that you ought not to talk to him, and then didn't you say that you could give this juror a full history, and, 'By God, I want you to stick it to him?' A. No, sir.

"Q. That didn't occur? A. No, sir.

"Q. 'Stick it to him' or 'stick him;' that conversation or words of that nature didn't occur? A. No, sir."

The defendant, in order to show the animus of the witness and his ill-feeling towards the defendant, and to impeach his credibility, produced the juror Joe Copass, and the following occurred:

"Q. Mr. Copass, where do you live? A. South Moniteau.

"Q. How long have you lived there? A. How long? I have lived in South Moniteau, well, about thirty-five years.

"Q. Did you see William Spry, who is a witness in this case on behalf of the State, who was here in attendance on yesterday morning? A. Well, as to the gentleman's name, I didn't know anything about it at that time, but I have learned since then that that is his name; yes, sir, I saw him.

"Q. Is that the gentleman? A. Yes, sir; that is the gentleman.

"Q. Where did you see him? A. Back of Mr. Walterscheid's saloon.

"The State objected and the objection was sustained, to which ruling on the part of the court the defendant, by counsel, then and there duly excepted at the time.

"Mr. Corum: We offer to prove by the witness, Joseph D. Copass, that he was one of the panel of forty from which the jury in this case was selected; that after the panel of forty had been selected and sworn

as the law provides, and before the challenges had been made, William Spry, witness on behalf of the State, approached the said Joseph D. Copass and inquired of him if he were not one of the forty from whom the jury were to be selected to try the defendant, Silas Darling; that witness, Joseph D. Copass, told the said William Spry that he was a member of the panel of forty and that he might be selected as one of the twelve jurymen to try the case and that he, Spry, must not talk to him about the case, and that thereupon the said William Spry told the said Joseph D. Copass that that was the very reason that he wished to talk to him about the case, and that the said Spry said that he was acquainted with the full history of the case and wished to tell the said juror, Copass, about it, and he (Copass) might be one of the twelve to try the case, and that the said Spry further said, 'By God, I want you to stick him if you are on the jury.'

"The State objected, and the objection was sustained; to which ruling on the part of the court the defendant, by counsel, then and there duly excepted at the time.

"Mr. Corum: We also offer to prove that Stephen A. Smith, who was a member of the panel of forty, was also approached by witness Spry, after the panel of forty had been selected, and before the challenges had been made and that the said Spry made the same statement in substantially the same language to juror Stephen A. Smith that he made to juror Joseph D. Copass. The court held that the evidence was incompetent and excluded it; to which ruling and action of the court the defendant then and there excepted at the time."

In 1 Greenleaf on Ev. (16 Ed.), sec. 450, it is said: "The partiality of a witness for one party or side, or his prejudice against the other side, is always regarded as bearing on the trustworthiness of his testimony. One way of showing the existence of such bias is his prior

expression of such feelings. Thus it is always allowable to inquire of the witness for the prosecution, in cross-examination, whether he has not expressed feelings of hostility towards the prisoner. The like inquiry may be made in a civil action; and if the witness denies the fact, he may be contradicted by other witnesses.''

While the court permitted the defendant to cross-examine this witness as to certain statements made by him indicating bias and prejudice against the defendant, all of which he denied, yet the court refused to permit the defendant, with the view of impeaching the witness, to introduce evidence tending to show that he had in fact made such statements. It is claimed by the State that this ruling was in the discretion of the court, and that unless there was an abuse of discretion the judgment should not be reversed on account of such ruling. There are authorities which sustain this position; but the general rule seems to be as announced by Mr. Greenleaf, that, ''if the witness denies the facts showing bias, the cross-examining party may call other witnesses to contradict him.'' [30 Am. and Eng. Ency. of Law (2 Ed.), 1088-89.] In Schuster v. State, 80 Wis. l. c. 116, it is said that ''it is legitimate cross-examination to interrogate an opposing witness as to his relations to the parties and the litigation, his motives, interests, inclinations, and prejudices, his means of obtaining correct and certain knowledge of the facts to which he testifies, and the manner in which he has used those means. Such testimony is not collateral and irrelevant to the issue, and the party calling it out, if it be adverse to him, may contradict it by other testimony for the purpose of discrediting the witness. All of this is quite rudimentary in the law of evidence.''

In the case of State v. Jones, 106 Mo. l. c. 311, it is said: ''The defendant rightfully complains of the action of the court in excluding the evidence of Arm-

strong to the effect that the prosecuting witness, Robertson, had threatened to break up old man Jones, the father of the defendant, and his family. The witness Robertson had denied using such language. It was competent for the purpose of impeaching him, and to show his animus in the prosecution."

So, in State v. Pruett, 144 Mo. 92, one Hugh Chrisman was a witness for the State. He was asked by counsel for defendant if he had not "threatened to kill defendant or run him off the place." The trial court held that the evidence was incompetent, and excluded it. In passing upon the action of the court in that regard, this court said: "This question was clearly competent, since it is always competent to show by such an interrogatory that the witness has a bias against or hostile feeling towards a party litigant, and if the witness deny such feeling, etc., he may be contradicted, because it is always important and all-important to show that the witness does not stand indifferent between the contending parties."

Proof of the acts and statements of a witness tending to show his prejudice against the defendant, and his interest in the prosecution, is always admissible; and this being true, it was competent for the defendant in this case, for the purpose of impeaching witness Spry, who denied upon cross-examination having made certain statements indicating prejudice toward the defendant, to show by other witnesses that he had in fact made such statements.

Instruction numbered 8, given on the part of the State, is complained of upon the ground that it deprived Ernest Darling of the right of self-defense. The instruction is as follows:

"If you find from the evidence that prior to the killing of Samuel Jeffress, Ernest Darling sought the deceased, Samuel Jeffress, for the purpose of assaulting and whipping him, but without any felonious intent

to use upon him a deadly weapon, or to inflict upon him great bodily harm, and the defendant, Silas Darling, with knowledge of the intention of his brother, Ernest, to so whip said Sam'l Jeffress, accompanied his brother Ernest Darling to the scene of the tragedy for the purpose and with the intention of aiding, encouraging or assisting his brother, Ernest, if necessary, in making said assault, and was then and there present at the time of such assault, for the purpose and with the intention of aiding, encouraging or abetting his brother, Ernest Darling, therein, if necessary, and that during such difficulty it became necessary for the said Ernest Darling to kill and he did kill said Jeffress, in order to save his own life, then the defendant, Silas Darling, is guilty of manslaughter in the fourth degree, and you will so find.''

Counsel for defendant, in endeavoring to interpret this instruction, says: ''If he, Ernest Darling, went to where the deceased was for the purpose of whipping him, without any felonious intent to use upon him a deadly weapon or to inflict great bodily harm, and without a deadly weapon, and thereupon Jeffress, without provocation or excuse, willfully assaulted him with a monkey wrench, as testified by Ernest Darling and the defendant, and it became necessary for the said Ernest Darling to kill and he did kill said Jeffress in order to save his own life, then the defendant (or Ernest Darling) is guilty of manslaughter in the fourth degree.''

We do not think this a fair interpretation of the instruction, for it does not contemplate that Jeffress provoked or made the assault, but it does say that if the defendant ''was then and there present at the time of such assault,'' meaning the assault made by his brother Ernest upon the deceased. It is true the instruction does say ''during such difficulty;'' that is, the difficulty which was the result of Ernest Darling seeking the de-

ceased for the purpose of assaulting him, and not any difficulty caused or brought on by Jeffress.

We quite agree with defendant's counsel in this particular, that if a person provokes a combat, or brings on a difficulty, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, and this without regard to the extremity to which the defendant may have been reduced in the combat; and that if a person, intending an ordinary battery only, seeks his adversary and provokes a combat or brings on a difficulty with a design to commit a battery, and death is the result of such battery, he is guilty of manslaughter, without regard to the extremity to which he may have been put.

The instruction is, we think, in substantial compliance with the last proposition. [State v. Partlow, 90 Mo. 608; State v. Gilmore, 95 Mo. 554.]

It does not seem to us that the instruction in any way trenched upon the right of self-defense of Ernest Darling, and when construed, as it should be, with reference to the assault by him upon deceased, is not of such a character as would justify a reversal of the judgment.

Defendant asked a number of instructions which the court refused to give, and in so doing it is claimed the court committed error. Eighteen instructions were given by the court, which covered every phase of the case, and which, with the exception of the ninth instruction, are free from substantial error. There was, therefore, no occasion for giving any of the instructions asked by the defendant.

The court should not have permitted the State to prove by witness Charles Carroll that, on his way to Blackwater on the day of the homicide, he passed within a quarter of a mile of the Darling home and in plain view thereof, in the absence of evidence that the defendant or his co-indictees either saw or were in a posi-

tion to see him, or that he saw one or more of them as he passed. [State v. Darling, 199 Mo. 168.]

For the reasons stated, the judgment is reversed and the cause remanded for further trial.

*Fox, P. J.,* and *Gantt, J.,* concur.