## THE STATE v. WILLIAM MITTNER, Sr., Appellant.

### Division Two, February 19, 1913.

1. MANSLAUGHTER: Sufficiency of Evidence. Defendant and deceased engaged in a quarrel over a watch, which defendant claimed as the result of a raffle. Defendant invited deceased to come down from the porch in front of deceased's saloon into the street and fight him. Deceased remarked, "You are a fool," and went back into his saloon; whereupon, defendant said to his two sons who were present, "Boys, go get your gun; he has to go back after something, he won't fight fair." One of the boys started home for his gun, and defendant and the other supplied themselves with stones and remained in front of the saloon. In a very short time deceased and his barkeeper came out on the porch both unarmed, and defendant, challenged them to a fist fight. The barkeeper accepted the challenge, but deceased remained silent. Defendant asked the barkeeper if he would fight fair, and on receiving an affirmative answer threw down his rock, and after requesting those present to see that he had a fair deal, entered upon the fist fight, which progressed vigorously for several minutes, when

defendant's son who was present started up towards the combatants with a stone in his hand, whereupon deceased stepped in front of him and holding up his hands towards him said,. "Stand back." At this point the other son returned with the gun, and pointing it at deceased threatened to shoot him. Deceased said nothing, but walked ' towards his saloon, and' as he stepped on the porth· the son shot him in the neck, killing him instantly. Defendant's witnesses testified that when deceased first started back into the saloon defendant said to him, "Go get your damned gun, you won't fight fair nohow." *Held*, that there was substantial evidence to sustain a verdict of murder in the second degree, since defendant was the inciting cause of the murder, but defendant cannot complain that he was convicted only of a lower degree of the crime, to-wit, manslaughter in the second degree.

2. **WITNESS: Credibility.** The veracity of all the witnesses is. to be determined by the jury.

3. **MANSLAUGHTER: Entering into Fist Fight: Intent.** Proof that defendant invited deceased to enter into a fist fight with him, and on defendant's refusal stated to his son seventeen years of age that deceased would not fight fair and to go get his. gun, and after the son's departure he and deceased's bartender engaged in a fist fight and were so engaged in the presence of deceased when the son returned and shot deceased, although defendant may not have wished his son to kill deceased and may not have intended to do anything more than to whip deceased in a fair fist fight, is sufficient to authorize an instruction for manslaughter, and a conviction.

Appeal from St. Francois Circuit Court.—*Hon. Peter H. Huck,* Judge.

AFFIRMED.

*Benjamin H. Marbury* for appellant.

Some degree of participation by William Mittner, Sr., in the act of William Mittner, Jr., in killing Iahn, must be shown in order to establish criminal liability; something more than the mere presence of Mittner, Sr., even accompanied with his approval of the act done, is necessary to make Mittner, Sr., an aider and abettor; Mittner, Sr., must have materially participated, either in the plan or its execution. State

v. Darling, 216 Mo. 45; State v. Ostman, 147 Mo. App. 422; 1 McClain on Criminal Law, secs. 194 and 197.

*Elliott W. Major,* Attorney-General, and *Ernest A. Green,* Assistant Attorney-General, for the State.

(1) The evidence was ample to sustain the verdict of the jury as to this appellant. State v. Forsha, 190 Mo. 331; State v. Walker, 98 Mo. 95. One who is present aiding and abetting others in the perpetration of an offense is guilty as a principal in the crime, although he did not personally participate in its commission. State v. Nelson, 98 Mo. 414; State v. Miller, 100 Mo. 606; State v. Brown, 104 Mo. 374; State v. Crab, 121 Mo. 554. (2) Under the testimony of the defendant, Mittner, Jr., when taken into consideration with all the other testimony in the case, the verdict finding appellant guilty of manslaughter in the second degree can be upheld, although the preponderance of the evidence showed him to be guilty of murder in the second degree. Sec. 4461, R. S. 1909; State v. Blunt, 91 Mo. 508; State v. Dierberger, 96 Mo. 676.

BROWN, P. J.—Convicted of manslaughter in the second degree, defendant appeals from a judgment of the circuit court of St. Francois county sentencing him to serve three years in the State penitentiary.

The evidence discloses a controversy between defendant and one William Iahn about the raffling of a watch. The deceased, William Iahn, kept a saloon in the village of Frankclay, Missouri, and employed Tom Gould as his barkeeper. There also resided at the same village the defendant, William Mittner, Sr., and his two sons, Casper, aged eighteen and William, Jr., aged seventeen.

The deceased and the barkeeper raffled a watch, at which one Patterson took several tickets or chances.

Patterson deposited his tickets with defendant, and then went to another town. One of Patterson's tickets drew the watch, but deceased and his barkeeper refused to deliver it to defendant, claiming they had instructions from Patterson to hold it for him.

The testimony on the part of the State is to the effect that on the evening of May 4, 1911, several days after the watch raffle, a number of boys were pitching horseshoes on the street near the saloon of deceased. The defendant and his two sons were present. The deceased came out on the porch of his saloon and defendant was heard to say to him: "You fellows don't want to do what is right about that." (Presumably referring to the watch raffle). Deceased replied: "I have told you about that, I won't give the watch to you or any other person until I find out the right one to give it to."

The defendant's sons hearing the quarrel walked down near their father. Defendant invited deceased to come down off of the porch and fight him. Deceased remarked to defendant: "You are a fool," and walked back into his saloon; whereupon defendant said to his sons: "Boys, go get your gun; he has to go back after something, he won't fight fair." When this statement was made defendant's son, William Mittner, Jr., started home for his gun, and defendant and his other son armed themselves with rocks and remained in front of the saloon.

In a very short time deceased and his barkeeper, Gould, came out on the porch. Both were unarmed. Gould stated that he would not give up the watch until he found out who ought to have it. Defendant then challenged both Gould and deceased to a fist fight. Gould accepted the challenge, but deceased remained silent. Defendant asked Gould if he would fight fair, and, upon receiving an affirmative answer, threw down his rock, and, after requesting those present to see that he had a fair deal, entered into a fist fight with

Gould. The fight progressed vigorously, but without special interest for several minutes when defendant's son Casper started up towards the combatants with a rock in his hand; whereupon the deceased stepped in between them and held his open hands out towards Casper Mittner, saying: "Stand back." At this juncture defendant's son William Mittner, Jr., returned with a shotgun, which he pointed at defendant and threatened to shoot him. Deceased said nothing, but walked towards his saloon. When he stepped up on the porch of his saloon William Mittner, Jr., shot him in the neck, killing him instantly.

Defendant being engaged in a fight with Gould did not notice the arrival of his son, but when told that his boy had killed Iahn he quit fighting Gould and exclaimed: "Oh, my God! kill me; oh, my boy, oh, my boy!"

At the time he was killed, deceased carried no deadly weapons, and there is no evidence that he desired to fight defendant or any one else.

Defendant testified that he did not tell his boy to get the gun and did not want Iahn killed. Other evidence on the part of defendant is only different from that given by the State's witnesses in one material point, to-wit: defendant's witnesses testified that they did not hear defendant tell his boys to go after the gun, but that after the first quarrel, when deceased went back into the saloon, they heard defendant say to deceased: "Go get your damned gun, you won't fight fair nohow."

One of the witnesses testified that when told that his son had killed Iahn defendant exclaimed: "For God's sake, what did he do it for? I would rather have both arms cut off than that. I wish it was me instead of Iahn."

Another witness testified that defendant exclaimed: "Oh, my God, my boy will be hung, and I hope I will be hung with him!"

Defendant and his two sons were jointly indicted for murder in the first degree. A *nolle prosequi* was entered as to Casper Mittner. William Mittner, Jr., was convicted of murder in the second degree and given twenty years in the penitentiary and does not appeal. The father (defendant), who was jointly tried with his son (William Mittner, Jr.), was found guilty of manslaughter in the second degree and his punishment assessed at three years in the penitentiary.

Appellant makes no complaint against the instructions or that his punishment is excessive. He places himself squarely on the assignment that the evidence does not warrant a conviction of any offense, and that the judgment should be reversed and the appellant discharged.

Sufficiency of Evidence.

We have read the record very carefully and while the testimony is conflicting, there is substantial evidence to sustain even a verdict of murder in the second degree, had the jury seen fit to convict defendant of that crime. Of course, defendant cannot complain that he was convicted of a lower degree of crime than the evidence warranted. [Sec. 5115, R. S. 1909.]

Two witnesses testified positively that when deceased abandoned the first quarrel and walked back into his saloon, defendant told his sons to ''go get your gun;'' that defendant had to go back after something and would not ''fight fair.'' The son who went after the gun and did the killing did not hear any threat made by deceased (if such threat was ever made); and, consequently, could not reasonably have anticipated any attack by deceased from the mere fact that the latter walked into his own saloon.

If it had not been for the request of the father to get the gun, coupled with the further groundless charge that deceased had gone back to get something and ''won't fight fair,'' the son would most likely have remained in the peace and no one would have been killed.

The father's words were calculated to, and doubtless did, inflame the young man's mind and caused him to believe that deceased had some kind of a deadly weapon in his saloon with which he would assault the defendant (his father) ; consequently, when the son returned with the gun and saw deceased starting to return to the saloon, his father's words were ringing in his ears, and he thought he ought to kill deceased and thus prevent him from securing any arms or weapons.

We do not see anything else in the record which could have spurred the young man on to commit such an unprovoked murder. It is manifest that deceased was not only unarmed but had no desire to fight anyone, either with fists or weapons. The exclamations or remarks of defendant when he ascertained that his son had killed deceased ("My son will be hung and I hope I will be hung with him") tend to show that defendant suddenly realized that his request to get a gun and his statement that deceased would not "fight fair" had caused a murder to be committed.

Of course, the fact that defendant threw down his rock and engaged in a "fair fist fight" with Gould tends to indicate that he would have been satisfied, if given an opportunity, to whip deceased with his fists, but he seemed determined to have a fight of some kind at any cost. This indicated a bad spirit. We have no way of knowing precisely what defendant intended in bringing on the hostilities, but his unfortunate act in sending his boy for the gun and indicating to the boy that deceased was seeking to use a deadly weapon were the very things which produced the tragedy.

The veracity of all the witnesses who testified was a question for the jury. If the witnesses for the State are believed, defendant unquestionably **Credibility of Witnesses.** put in motion the very machinery which caused the death of an inoffensive, unarmed citizen. When we consider the youth of defendant's son, we must conclude that what the father

said to him bore exactly the kind of fruit which a reasonable person would expect it to bear, and, therefore, it is meet and proper that the father should be punished for the crime which he induced his son to commit.

The case of State v. May, 142 Mo. 135, is unlike the one at bar and is no authority in this case, for the reason that in the May case the inflammatory language, "Catch him and kill him," was used by the man who did the killing; consequently, the man to whom the inflammatory words were spoken, but who did not kill anybody, was held not liable for the homicide. The views expressed in the cases of State v. Nelson, 98 Mo. 414; State v. Miller, 100 Mo. 606; State v. Brown, 104 Mo. l. c. 374, and State v. Crab, 121 Mo. 554, are without weight, because those cases are likewise wholly different from the one now in judgment.

In the case of State v. Darling, 202 Mo. 150, l. c. 170, the court approved an instruction which authorized a conviction of manslaughter upon proof that defendant went with his brother to where an enemy was working, intending only to whip the enemy with their fists, but the brother resorted to a deadly weapon resulting in a homicide.

**Manslaughter.**

There is no reversible error in the record and the judgment of the trial court is affirmed.

*Faris* and *Walker, JJ.,* concur.